J. CLARKE DEAN and Others, Copartners, Composing the Firm of DEAN, ONATIVIA & Co., Respondents, v. FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Appellant.

First Department, November 6, 1931.

*Joseph M. Proskauer* of counsel [*J. Alvin Van Bergh* and *Fred Boehm* with him on the brief; *Fred Boehm*, attorney], for the appellant.

*Max D. Steuer* of counsel [*William F. Unger* with him on the brief; *Gilman & Unger*, attorneys], for the respondents.

TOWNLEY, J. The judgment is based on two causes of action on two bonds, a primary fidelity bond for $25,000 and an excess fidelity bond for $125,000. The first covered any loss through the dishonesty of employees; the second covered losses through dishonesty of employees except losses arising out of fictitious market trading.

It was affirmatively demonstrated, on investigation of the

accounts of the plaintiffs, that of the sum claimed in the complaint, the plaintiffs were not liable for $11,600 because that sum represented losses incurred in trading transactions not within the terms of the excess bond. It is also conceded that while the plaintiffs were actually out of pocket the amount claimed in the complaint, only $30,700 of the losses were proved, beyond any question, to have resulted within the life of the policy. As to this amount of $30,700 the defendant admits liability. It is the remaining sum of $31,933.84 included in the judgment which is the subject of this appeal.

An understanding of the issues presented requires a somewhat detailed discussion of the circumstances which made the thefts possible and the method employed by plaintiffs' employees to accomplish them. The plaintiffs' firm was a stock exchange house. A petition in bankruptcy had been filed against the firm and a receiver appointed on July 3, 1925. Various banks and brokers holding repledged collateral belonging to plaintiffs' customers liquidated the loans by selling the collateral. When the petition was dismissed July 18, 1925, business was resumed. The market had advanced after these loans had been liquidated. In order to make good to their customers the loss resulting from such sales, plaintiffs credited their accounts with the difference between the price at which their securities had been sold and the market price on the date when the accounts were re-established. A liquidation account was opened to take up the offsetting credits to the various customers. The actual loss that plaintiffs made good with their customers was $399,816.70.

The system adopted by the employees was to establish false credits in the accounts of customers whose securities had been sold and then either make cash withdrawals against such credits or use them as a basis for market operations. To offset these credits, a charge had to be made against the liquidation account. False credits aggregating $60,033.84 were opened during the summer of of 1925. Prior to September thirtieth, because of an audit, it was necessary for the employees to cover up these credits as of September 30, 1925. It appears that they did this by entering the liquidation loss in the private journal and the private ledger as $459,850.54 instead of the true figure of $399,816.70. The trial balance of the liquidation account as of that date and the liquidation ledger showed, however, that the total loss in the liquidation account was only $399,816.70. The private journal showed a credit to liquidation losses of $459,850.54 and a debit of the same amount to the profit and loss account. The profit and loss account in the private ledger shows that the liquidation loss was entered as

$459,850.54. These entries mean that the sum of $459,850.54 was charged to the firm's capital, whereas the amount which should have been charged was $399,816.70. The difference of $60,033.84 was thus, as far as the books were concerned, "taken" from the firm's capital as of September 30, 1925.

This method of balancing the books, for purposes of the September audit, successfully concealed the false credits which had been given to the various accounts. It was, however, but a protective step in the process of accomplishing the defalcation. Before the criminals could realize any benefit from the conspiracy, it was necessary, by one method or another, to withdraw money from the customers' accounts which had been overcredited. It was possible to trace the actual times at which some $28,100 was withdrawn from these various accounts. Owing, however, to the fact that the conspirators destroyed many of the records covering the defalcations, it was impossible to prove, either from the books or by the testimony of any of the criminals, when they withdrew the balance of the claim, namely, $31,933.84. If the money involved in the claim was not actually withdrawn from the overcredited customers' accounts before April 6, 1926, the date of expiration of these policies, the defendant is not liable because no loss had actually been suffered by the firm and all that had occurred was the making of certain confusing book entries.

The question before the trial court was whether, in the absence of affirmative testimony and documentary evidence, it was possible to infer that the money was actually abstracted before April sixth.

Respondents claim that the fact of such withdrawals is established, first, by demonstrating that the entry against the liquidation account on September 30, 1925, consummated the theft. The fallacy of this reasoning is apparent if we examine one specimen account, the Spath account. This account was opened by an actual deposit of $500. By a false credit given July 30, 1925, the account apparently contained $10,500. The compensating false debit was not made until the following September thirtieth. Meanwhile in August and September, prior to the entry of the debit, larcenous withdrawals totaling $11,288.04 were made. As to this account, therefore, a large loss was sustained by plaintiffs before the debit entry was made. After September thirtieth further losses of $4,457.60 by withdrawals and $4,814.36 by fictitious trading were sustained. Obviously, neither the false credit entry nor the false debit entry caused the loss. The entries were to conceal the actual thefts, whenever made, not to consummate them.

Respondents' second argument is that the court should draw an inference that it would be a natural tendency of the conspirators

to get the money as soon as possible and that, therefore, it is reasonable to suppose that it was all stolen prior to April 6, 1926. No inference of haste in withdrawing the money is inevitable, however, since one part of the scheme was to establish credits which might be used in market speculations. Thus a given credit might have run for an indefinite time. Moreover, as is shown in the opinion below, some money was withdrawn from an account involved in the present judgment after April sixth.

Respondents' third claim is that the enumerated missing records of a date later than April 6, 1926, can be shown to be irrelevant, that there are no later entries affecting the present claim, and that, hence, the thefts must have occurred prior to April sixth. The trial court based its decision on the ground that the relevant records were complete after November 4, 1925, and that, therefore, the money must have been withdrawn before that date. Of this, it is sufficient to say that (a) since all the missing records are concededly not known, they have not all been enumerated; (b) at least one of the enumerated accounts, the Abrahams' account, which involved fictitious trading, may have had credits during the running of the policy which would have offset losses by actual theft; (c) there is nothing to show that some of the old credits were not transferred to other running accounts, and (d) there is nothing to show how much of each loss was due to trading losses and how much to actual withdrawals.

Fourth, respondents make much of the device used by the thieves to cover up further defalcations which might otherwise have been discovered at the audit of March 31, 1926. If the credits were established prior to September 30, 1925, and if the debit in the liquidation account covered those credits, there was no need for further book entries in the form of short sales on March 31, 1930. Furthermore, when the audit of March thirty-first was investigated at the trial, the testimony was conclusive that the short-sale credits had nothing to do with the claim in suit.

There is a total failure of proof showing when the losses occurred or whether the losses were losses in trading or cash abstractions.

The judgment so far as appealed from should be modified by reducing the amount thereof to $30,700, with interest from March 31, 1927, and costs, and as so modified affirmed, with costs to appellant.

FINCH, P. J., McAvoy, MARTIN and O'MALLEY, JJ., concur.

Judgment so far as appealed from modified by reducing the amount thereof to $30,700, with interest from March 31, 1927, and costs, and as so modified affirmed, with costs to the appellant.