## PRIOR LAKE STATE BANK v. NATIONAL SURETY CORPORATION.

80 N. W. (2d) 612.

January 4, 1957—No. 36,851.

*Durham, Swanson & Lasley* and *Julius A. Coller II,* for appellant.
*Robins, Davis & Lyons, Richard Converse,* and *A. H. Markert,* for respondent.

FRANK T. GALLAGHER, JUDGE.

Appeal from an order of the district court denying defendant's motion for amended findings of fact, conclusions of law, and for additional findings, or in the alternative for a new trial.

The action is for recovery of money against the surety on a banker's blanket bond contract between the plaintiff, Prior Lake State Bank, herein referred to as the bank, and the defendant, National Surety Corporation, herein referred to as the surety, said action arising out of alleged dishonest acts of the bank's employee. On March 1, 1946, the surety issued its bond to the bank by which it agreed to indemnify the bank in the amounts referred to in the bond, and subsequent riders, against the loss of property not exceeding $25,000 through any dishonest acts of its employees, subject to the conditions of the bond.

For many years prior to 1951, and including the period from March 1, 1946, when the surety's bond was issued, until November 11, 1951, one A. P. Groth was cashier and managing officer of the bank, which was operated and managed by him with the assistance, usually, of one employee whose duties were largely those of bookkeeper.

During the spring of 1951 a routine examination by the Federal Deposit Insurance Corporation indicated that there might be irregularities in the bank records. In October 1951, a special examination of the books was initiated by the Federal Deposit Insurance Corporation and conducted by one Alonzo Canaday. This examination disclosed apparent shortages in the books of the bank in the amount of $23,826.43, which were called to the attention of the officers and directors of the bank shortly before November 1, 1951. Groth, who was absent from the bank from September 19, 1950, to December 30, 1950, because of illness, resigned his position on November 11, 1951, and died in May 1954, prior to the hearing before a referee or the trial of this action.

On November 6, 1951, the bank through its president informed the surety of the apparent irregularities, defalcations, and shortages in its income account record. On the recommendation of Canaday, the bank then hired an auditor to conduct an examination and audit of the income of the bank to ascertain what loss had occurred and whether it could be traced to dishonesty of Groth. One Harold E. Sandall, a certified public accountant, was employed to make that

examination and audit, which he began in December 1951 and completed late in 1952.

Upon receipt of the bank's letter of November 6, 1951, the surety engaged its own auditors to make an examination of the bank. Thereafter the bank filed two proofs of loss based on its auditor's findings, one dated July 18, 1952, in the sum of $24,420.61, and the other dated December 8, 1952, for $8,948.89. This action was commenced on December 30, 1952. The referee found that the action was brought within twelve months after the discovery of the loss by the bank and that the loss which it sustained was due to the dishonest acts of Groth, the cashier, while he was employed by the bank. He recommended that judgment be entered in favor of the bank against the surety in the sum of $15,470.14, with interest, costs, and disbursements. The interest at six percent recommended on various amounts was as follows:

On the sum of $1,634.22 from December 31, 1946
On the sum of $3,104.65 from December 31, 1947
On the sum of $3,520.71 from December 31, 1948
On the sum of $2,530.44 from December 31, 1949
On the sum of $2,507.32 from December 31, 1950
On the sum of $2,172.64 from December 31, 1951

The trial court adopted the findings of fact and conclusions of law and report of the referee as its findings and conclusions, including the memorandum attached thereto, and ordered judgment accordingly.

On appeal the surety assigned as error that the findings of fact and conclusions of law are contrary to law and not justified by the evidence and set forth certain specific findings which it claimed were not sustained by the evidence. The following legal issues were raised:

(1) Was the action instituted within 12 months from the discovery of the loss as required by the terms of the bond?

(2) Did the testimony on behalf of the bank show that it suffered

pecuniary loss as a result of dishonest acts which would entitle it to recover?

(3) Were the court's findings of fact as to amount justified by the evidence?

(4) Was the interest finding proper and correct?

■ With reference to the date of the commencement of the action, the bond provided in part:

"At the earliest practicable moment, and at all events not later than ten days, after the Insured shall discover any loss hereunder, the Insured shall give the Underwriter notice thereof by registered letter or telegram, addressed to it at its Home Office, and shall also, within three months after such discovery, furnish to the Underwriter at its Home Office affirmative proof of loss with full particulars. Legal proceedings for recovery of loss hereunder shall not be brought prior to the expiration of three months from the furnishing of such proof, nor after the expiration of twelve months from the discovery of such loss, * * *."

The surety contends that the discovery of loss occurred on or about October 20, 1951, and definitely prior to 12 months before the commencement of this action. It relies on the facts that the matter of irregularities or shortages was first reported by Canaday, the Federal Deposit Insurance Corporation examiner, to the directors of the bank prior to November 1, 1951; that the surety was informed through the letter from the bank of November 6, 1951,[1] of the discovery of apparent defalcations and irregularities; and that the

[1]An examination of the letter of November 6, 1951, set out in the brief of the surety, discloses that the bank advised the surety that certain apparent defalcations and irregularities had been disclosed in the books, records, and affairs of the bank, but that the extent and volume of admitted irregularities had not been determined. It further expressed the intention of the bank to employ an accounting firm to make an audit and stated that upon completion of the audit the surety would be advised as to the extent of the peculations. It stated that the purpose of the letter was to point out to the surety that irregularities existed in the bank for which its cashier, Groth, had admitted certain transactions and had been unable and unwilling to explain others.

proofs of loss signed by the bank president on July 18 and December 8, 1952, refer to losses which were "discovered by us on or about the 20th day of October, 1951, * * *."

The testimony in the record, as previously stated, shows that Canaday did discover apparent shortages and inform the directors of the bank concerning them prior to November 1, 1951. Groth's admission that the bank had been shorted on loan interest income was also made known to the directors at this time. The letter from the bank to the surety and the statement in the proof of loss refer to the knowledge of the situation, as above stated, that directors had at that time. Our inquiry concerns whether this knowledge was sufficient to constitute a discovery of loss due to dishonest acts so as to require the referee to find such discovery as of the above date.

The parties to a contract may limit the time within which an action may be brought to a period less than that fixed by the general statutes of limitation provided the limitation is not unreasonably short, but such provisions are not especially favored and are construed strictly against the party invoking them. 11 Dunnell, Dig. (3 ed.) § 5600; Fitger Brewing Co. v. American Bonding Co. 115 Minn. 78, 131 N. W. 1067. In 50 Am. Jur., Suretyship, § 348, it is stated that:

"* * * A provision for notice after knowledge of the wrongful act or after discovery of the resulting loss does not require notice when the obligee merely suspects or has reason to suspect wrongdoing."

An insured cannot wait to determine the extent of loss, but he does not have to give notice until he is justified in believing that a loss had occurred through dishonesty rather than through errors consistent with integrity. Brown v. Maryland Cas. Co. 111 Vt. 30, 11 A. (2d) 222, 129 A. L. R. 1404.

This court has adopted the rule that suspicions of irregularity do not require the insured to assume that the employee is guilty of dishonest acts. Gamble-Robinson Co. v. Massachusetts Bonding & Ins. Co. 113 Minn. 38, 129 N. W. 131. Concerning timeliness of discovery of loss, in Citizens State Bank v. New Amsterdam Cas. Co. 177 Minn.

65, 68, 224 N. W. 451, 453, this court said that "Considerable time was spent in investigation, and the finding of the trial court that discovery of the loss was not made until plaintiff received report from the banking department eight days before the notice was given is fairly sustained by the evidence."

The question here is not concerned with the time for giving notice but with the time for bringing suit. However, in this bond both provisions are tied to the time of discovery of loss due to dishonest acts. We must consider the facts and circumstances here; namely, that the numerous and somewhat incomplete records of a bank are involved and that dishonesty if present could be "covered up" and difficult to distinguish from carelessness. It is therefore our opinion under the record here that the referee was justified in finding that the discovery of the loss due to dishonest acts did not occur until the bank's auditor was well into his examination and that this action was commenced within the twelve-month period required by the bond.

■ The second issue raised by the surety is whether the testimony on behalf of the bank showed that dishonest acts were committed and that the bank suffered pecuniary loss which would entitle it to recover. This case was tried before a referee whose findings and conclusions were adopted by the trial court. The findings of a referee when adopted by the court appointing him have the same force on appeal as the findings of a court and they will not be disturbed, whether based on oral or written evidence, unless they are manifestly and palpably contrary to the weight of the evidence. 16 Dunnell, Dig. (3 ed.) § 8327. This court in State ex rel. Northern Pump Co. v. Village of Fridley, 233 Minn. 442, 47 N. W. (2d) 204, stated that the findings of a referee had the effect of a special verdict which is entitled to the same weight as a general verdict and is final upon appeal where the evidence is conflicting.

This case involved a great deal of conflicting evidence particularly in connection with the different accounting methods and results obtained by the accountants retained by the bank and the surety with reference to the examination of the various books and records of the

bank. Our function as an appellate court in such cases was well stated by Mr. Justice Mitchell in Lundell v. Cheney, 50 Minn. 470, 52 N. W. 918. That case involved a long trial in connection with an accounting between two parties in which numerous witnesses were examined as well as 20 or more books of account and a great deal of documentary evidence. The court said (50 Minn. 472, 52 N. W. 918):

"* * * The case did not involve a single question of law, the issues being wholly of fact, and mainly of figures, of which there was a great mass, the labor of examining which was necessarily very great. In such a case, the main reliance of parties for correct results is the trial court. Even if we had all the evidence before us, we would not consider it any part of our duty, as an appellate court, to go through this great mass of accounts and figures to ascertain whether the referee had stated the account correctly. To entitle appellant to a reversal, he must be able to point out some clear and demonstrable error on part of the referee."

As stated before much of the testimony for both parties came from the respective accountants. The records of the bank were offered in evidence, and former and present employees, directors of the bank, and others testified concerning operation of the bank and other banks in the area. The testimony concerning loss was broken down according to the income accounts wherein loss was alleged. A brief résumé of the testimony in connection with the loss in the separate income accounts is necessary for an understanding of our conclusion on this issue.

In view of the fact that the bank records left much to be desired as a conclusive financial history during the period involved, the auditors were forced to reconstruct transactions as best they could. The special Federal Deposit Insurance Corporation examiner in his examination found apparent shortages of over $9,600 in the interest income accounts, by the accounting procedure of using a weighted average against the average loan; $335.06 in the auction fee account; $417.94 in the insurance account, part of which was based on apparently unpaid premiums on Groth's personal policies; and $105.80 in the over-and-short account. Regarding interest income on loans, the

bank's auditor after checking 6,024 loans established an apparent loss as to 457 of these loans. His method of taking the date of loan to date of payment to determine the amount of interest earned and checking this figure against the income account records to establish loss was generally appropriate except in some situations as pointed out by the surety and admitted by the bank.

Verification of some shortages was obtained from one business firm which had kept records of its transactions with the bank, and the interest income on loans as shown in the bank's records account for less than or none of the payments made by the business firm. For example, $40.05 was shown as an interest payment on the note while $20 was recorded as interest on that loan on the bank's books; in another case $22 appears to have been paid on a loan while no entry was shown in the bank's books.

The surety's auditor criticized 148 of these items, selecting those concerning which it admitted it had the best proof. The bank's auditor partially revised his figures concerning these 148 items, admitting error as to some of them. The referee heard the testimony of both auditors, had the written records of their findings, and had the figures on the revision made by the bank's auditor concerning the 148 loans which were criticized by the surety. It seems to us as we review the record that the testimony in behalf of the bank as originally given and revised establishes a loss and that the surety's testimony is not so convincing and certain that the referee would be required to find that the surety had conclusively disproved or weakened the testimony produced by the bank. This is especially true considering that the surety attacked those loans on which it felt most sure of its position and considering that the referee had the bank's written revision concerning those loans from which he could determine the state of the evidence on the loans not revised.

Regarding the loss found in miscellaneous bond income, the bank took the bonds that were held and the interest amount shown by the coupons to be due on certain dates and checked this information against the bank's income records to determine loss. The insurance commission loss was established by taking the insurance company's

earned commissions reports at the end of each year and checking the amounts against the bank's income account. The auction-fee income loss was established by checking with auctioneers to determine the number of auctions clerked and the total sales amounts involved in each auction, figuring the fee to be earned at the set rate and checking this amount against the bank's income account. It is our opinion that those methods, as generally stated here, were acceptable in view of the status of the bank's records and that they established a reasonable inference of loss which the referee could accept. The surety made some attempt at the trial to disprove some of the testimony regarding these losses, but mainly relies on the argument that the losses were not clearly established as such. Considering all the circumstances of this case we believe the testimony sufficient to support a reasonable inference of loss.

The loss in the cash over-and-short account was established by ascertaining that on a certain day this account showed an overage of $105.80. This sum was closed out with no record or explanation concerning the closing entry. The surety offered a possible explanation, but not so conclusive or certain an explanation that the referee would be required to adopt it as against the bank's testimony establishing loss.

The loss in the float exchange account was the largest loss established. The float exchange account represents income to the bank from the charges made upon cashing checks on out-of-town banks. The bank introduced testimony as to what these charges should be and testimony and records showing a day-by-day examination of this account. The loss was established by showing what amounts should have been earned considering the checks cashed each day and that invariably a lesser sum was entered in the income records. The manner of handling this account furnished a perfect opportunity for a daily appropriation by Groth. The surety again offered a possible explanation of the loss. Because this loss involved a considerable sum, both parties offered much testimony on the subject. After closely examining this testimony, we believe a reasonable inference of loss was established and that the testimony

on behalf of the surety was not so conclusive and certain as to require the referee to find that no loss existed.

With further reference to this issue the surety raises the question as to whether the testimony on behalf of the bank shows that "dishonest acts" of Groth accounted for the loss so as to entitle it to recover. "A fidelity bond indemnifying against loss by any act of 'fraud or dishonesty' is ordinarily held to extend beyond acts which are criminal; construing the bond most strongly against the insurer, the words are given a broad significance." 50 Am. Jur., Suretyship, § 335. A loss due to dishonesty can be established by circumstantial evidence. 50 Am. Jur., Suretyship, § 361; see, Hagsten v. Simberg, 232 Minn. 160, 44 N. W. (2d) 611.

The testimony contained in the record shows that Groth had stated to the special Federal Deposit Insurance Corporation examiner that the bank had been shorted on the loan interest income. Groth gave no further explanation of this nor did he explain the special examiner's finding of shortage in the auction-fee income, except to say that he may have disbursed funds unaccounted for and did not retain any receipts. After his resignation Groth refused to discuss the affairs of the bank with the special examiner.

Groth made all general ledger entries, totaled up the cash, and made the closing entries for each day's business. If he were absent from the bank on any day, he would enter that day's closing entries in the general ledger upon his return the next day. He did not hire additional help although he had the permission and invitation from the directors to do so. These methods of bookkeeping together with the income omitted from the books in the various income accounts furnish inferences of his dishonesty which could well be considered here by the referee. In addition to this, there is the verification by one business firm referred to above that it had paid more interest on certain notes than was accounted for in the income account of the bank. It must also be observed that the bookkeeping methods used with reference to the float exchange appear to have been well designed for the purpose of appropriating a daily amount from that portion of the bank's income.

In addition there was the incident of the "cigar box" found in the bank vault which was claimed by Groth as his although he had previously informed Canaday that he had no personal property on the bank premises. The box also contained notes payable to the bank made by parties regularly dealing with the bank. Groth's savings account also evidenced personal dealings in notes with regular customers of the bank. All of this evidence tends to show that Groth, without the knowledge or consent of the directors, engaged in personal transactions with the bank by purchasing notes of the bank and thereby provides a basis for a suspicion or inference of a breach of trust or dishonesty. See, Raymond Farmers Elev. Co. v. American Surety Co. 207 Minn. 117, 290 N. W. 231, 126 A. L. R. 1351.

During all this period Groth's salary was modest while the bank was making financial progress, thus providing a setting for temptation. While all the evidence is in the nature of circumstantial evidence, it does support a reasonable and logical inference of dishonesty.

■ The third issue raised by the surety is whether the amount of loss as found by the referee and adopted by the trial court is supported by the testimony in the record. Having gone over the record thoroughly and having discussed the methods used in finding the loss in connection with the second issue raised by the surety, we will not go into detail on this issue. Some alleged losses, such as the loss claimed in the "cigar box incident," were found not to have been established by sufficient proof and thus not included in the findings of loss. Also, the referee eliminated from his findings of loss those amounts which were traced to the period when Groth was absent from the bank due to illness in the last four months of 1950 and after his resignation. The accounting methods used were acceptable and did establish a definite amount of loss. The surety's testimony questioned these methods, but did not so conclusively demonstrate error or so conclusively disprove amounts that the referee could not reasonably find as he did. Again we point out that the referee heard the testimony firsthand, had the written evidence of the audits, and had the bank records before him.

In affirming the findings of the referee, as adopted by the trial court, that a pecuniary loss was established in the amount stated, due to the dishonest acts of Groth, we concede that more definite or conclusive evidence would have been desirable. However, we realize that in cases of this kind such evidence is sometimes difficult to obtain and that circumstantial evidence must be considered. In a civil case a recovery on circumstantial evidence is warranted if a preponderance of the evidence supports the recovery, and such evidence need not exclude every other reasonable conclusion. 1 Jones, Commentaries on Evidence (2 ed.) § 12, and note 20, adopted by this court in Hagsten v. Simberg, 232 Minn. 160, 44 N. W. (2d) 611. Thus while a loss in a definite amount due to dishonesty must be shown, a preponderance of the evidence was all that was necessary to establish these factors by the referee and trial court. Upon review it is our duty to consider whether, under the evidence, the findings were clearly erroneous, and in the instant case we are satisfied that they were not.

■ The surety contends that the court erred in ordering interest from the date of the shortage rather than the date of demand on the part of the bank. As shown in the table already set forth in this opinion, the court apparently allowed interest on the amount of the judgment, $15,470.14, from the date of the shortage, as for example, on $1,634.22 from December 31, 1946, on $3,104.65 from December 31, 1947, etc. The surety contends that, if any loss were sustained, interest cannot precede the time when the demand was made on it by the bank, to wit: July 18, 1952, as to $6,857.42, and December 8, 1952, as to $8,612.72. In support of its contention the surety cites Village of Hallock v. Pederson, 189 Minn. 469, 250 N. W. 4. That was an action against the village treasurer and the surety on his bond wherein the default occurred prior to April 1, 1928, and suit was commenced October 2, 1931. It was the claim of the surety that it was not liable for interest until the demand was made. The court in sustaining the surety's position held (189 Minn. 473, 250 N. W. 6):

"We think the weight of modern authority, as well as the better reason, allows interest as against sureties on official bonds only from the date of notice to the sureties of the breach, or a demand on them to make good such breach."

A similar holding was made in County Board of Education v. Fogarty, 191 Minn. 9, 252 N. W. 668, wherein this court decided that a surety on a public officer's bond was not liable for interest until notice of its breach or demand thereon.

The bank claims that it is entitled to recover interest on the various shortages from the dates they were found, citing Erie Trust Co. Bank v. Employers' Lia. Assur. Corp. 322 Pa. 132, 185 A. 224, 104 A. L. R. 1170; American Surety Co. v. North Texas Nat. Bank (Tex. Civ. App.) 14 S. W. (2d) 88; O'Connell v. American Surety Co. 284 Ill. App. 650, 2 N. E. (2d) 358; Hack v. American Surety Co. (7 Cir.) 96 F. (2d) 939.

It is our opinion in view of our own decisions cited above that the position of the surety is well taken with reference to interest and that the bank should be allowed interest on the $6,857.42 at six percent from the date it filed its demand on July 18, 1952, and on $8,612.72 from December 8, 1952.

Affirmed with the exception of the allowance of interest. Interest allowed on $6,857.42 at six percent from July 18, 1952, and on $8,612.72 from December 8, 1952.

### ON APPEAL FROM CLERK'S TAXATION OF COSTS.

On January 25, 1957, the following opinion was filed:

PER CURIAM.

Plaintiff-respondent objects to the taxation of costs on the ground that defendant-appellant is not the prevailing party herein inasmuch as the order appealed from was affirmed except for the adjustment of the date from which interest may be computed. It argues that the right to interest and the question of the date from which it should be computed were not raised below either on objection to the report of the referee or by alternative motion, citing Hildebrandt v. Hagen, 228 Minn. 353, 38 N. W. (2d) 815, as its authority.

We cannot agree with plaintiff-respondent's contention. In the instant case the defendant-appellant, among other things, objected that the conclusions of law are contrary to law. Inasmuch as in this case there was only one conclusion of law and we determined that the interest allowances were contrary to law, we modified that conclusion to that extent.

Therefore it is our opinion that the issue was adequately raised before the trial court and that Hildebrandt v. Hagen, *supra,* does not apply to the facts and circumstances of this case.

Clerk's taxation affirmed.