**BANCO DE SAN GERMAN, INC., and Banco Popular De Puerto Rico, Plaintiffs,**

v.

**MARYLAND CASUALTY COMPANY, Defendant.**

**No. 672-68.**

United States District Court, D. Puerto Rico.

May 17, 1972.

Rafael Baragano Diez, of Baragano, Arzuaga & Zayas, San Juan, P. R., for plaintiff Banco Popular de Puerto Rico.

Ivan Diaz de Aldrey, of Brown, Newsom & Cordova, San Juan, P. R., for plaintiff Banco de San German, Inc.

Francisco Agrait Oliveras, of Agrait-Oliveras & Otero, San Juan, P. R., for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

CHRISTENSEN, Senior District Judge (Assigned).

This is a diversity action filed by two Puerto Rican banks against a Maryland insurance company based on two fidelity bonds covering employees of plaintiff Banco de San German, Inc. The complaint alleged that plaintiff Banco de San German, Inc., suffered a loss in the

total sum of $1,544,365.30,[1] and that such loss is covered by the fidelity bonds issued by the defendant insurer.

A pre-trial conference was held on December 17, 1971, at which time the facts recited in Findings of Fact numbers 1 to 10, infra, were in substance stipulated by the parties as uncontroverted. The following disputed issues of fact were reserved for trial:

a. Whether between March 1, 1963, and October 20, 1967,[2] there were dishonest, fraudulent or criminal acts of any of the employees of Banco de San German which resulted in a loss to said bank covered by said bonds or either of them.

b. Whether between said dates[3] there was any loss to Banco de San German, Inc., through robbery, burglary, common law or statutory larceny, theft, false pretenses, hold-up, misplacement, mysterious or unexplainable disappearance, whether effected with or without violence or with or without negligence, on the part of any of the employees, or any other loss within the coverage of the primary bond.

c. Whether plaintiff Banco de San German discovered or was chargeable with knowledge of facts relating to the loss in question prior to September 18, 1967, when the limits on the primary bond were raised.

d. If defalcations or losses occurred within the coverage of either or both bonds, what were the specific amounts involved.

e. Whether plaintiffs are entitled, either under the terms of the bonds or under Puerto Rico law, to have the court assess their attorney's fees against defendant.

f. If attorney's fees are recoverable, what is the reasonable value thereof.

Trial was had before the court, sitting without a jury beginning January 24, 1972, and continuing thereafter to and including January 27, 1972, at which time the case was agreed to be submitted on briefs and proposed findings of fact and conclusions of law in accordance with an established schedule. The last brief was filed on April 5, 1972. The court thereby, and from the evidence, stipulations and admissions in the record, being fully advised, makes and enters the following:

## FINDINGS OF FACT

1. Plaintiff Banco de San German was and is a corporation organized and existing under the provisions of the Banking Act of Puerto Rico with its principal place of business in San German, Commonwealth of Puerto Rico. Plaintiff Banco Popular de Puerto Rico was and is a corporation organized and existing under the provisions of the Banking Act of Puerto Rico with its principal place of business in the City of San Juan, Commonwealth of Puerto Rico. Defendant Maryland Casualty Co. was and is a foreign corporation organized and existing under the laws of the State of Maryland with principal place of business in the city of Baltimore, and authorized to do business in the Commonwealth of Puerto Rico. The amount in controversy in this case, exclusive of interest and costs, exceeds the sum of $10,000.00.

1. This claim was reduced at the trial by $400.00 to $1,543,965.30 because of a minor inclusion through admitted error in the proof of loss.

2. The question whether the acts or loss, or both, occurred after rather than before March 1, 1963, inferentially raised a false issue, since as hereinafter noted the discovery of insured losses within the policy periods is the critical issue. Upon motion of the plaintiffs following submission of the case, the court has disregarded the date limitation, and pursuant to Rule 15, Fed.R.Civ.P. and in the interest of justice has deemed the pleadings and pretrial order amended to conform to the proof and the theory on which the case was tried which indicates that the bonds in question were "discovery" bonds and that discovery of whatever losses had been sustained was within the covered period.

3. See note 2.

2. On June 11, 1951, defendant, for good and valuable consideration, duly executed and delivered to plaintiff Banco de San German, Inc., a primary Bankers Blanket Bond, No. 917611–A, by which it agreed to and did insure plaintiff Banco de San German, against any loss through any dishonest, fraudulent or criminal acts committed by any of its employees, whether committed alone or in collusion with others, including loss of property, and against any loss of property in the premises through robbery, burglary, common law or statutory larceny, theft, false pretenses, hold-up, misplacement, mysterious unexplainable disappearance, and other risks covered by said bond not pertinent to this action.

3. On September 11, 1963, defendant for good and valuable consideration duly executed and delivered to plaintiff Banco de San German an Excess Bank Employee Dishonesty Blanket Bond No. 90–865751 under which it agreed to and did insure plaintiff Banco de San German against any loss sustained by the insured, including loss of money, securities or other property, over and above the amount of the primary Bankers Blanket Bond No. 917611–A through any dishonesty, fraudulent or criminal acts committed by one or more of its employees, whether acting alone or in collusion with others, the amount of the indemnity due to plaintiff Banco de San German under this bond not to exceed $1,000,000.00.

4. The primary Bankers Blanket Bond No. 917611–A, as a result of increased coverage on September 18, 1967, has a specified limit of $750,000.00; the coverage of $1,000,000.00 under the Excess Bond No. 90–865751 is over and above any amount of the primary bond.

5. These bonds were continuously in force since the date of their execution and delivery and were so at the time the losses claimed by plaintiffs were discovered.

6. Plaintiff Banco de San German timely notified the defendant of its claim of the discovery of alleged fraudulent, dishonest or criminal acts, filed a sworn Proof of Loss with the defendant in accordance with the terms of said bonds, and has duly performed all other conditions, provisions and terms of said bonds.

7. More than six months elapsed from the time plaintiffs submitted the required proof and notice of loss before the complaint in this action was filed by plaintiffs.

8. There were no other indemnity bonds owned by plaintiff Banco de San German covering its claim of loss or its employees.

9. Defendant has failed and refused to pay any part of said loss claimed by plaintiffs notwithstanding due demand of payment prior to the commencement of this action, except that it offered to pay the amount of $64,688.25; which claim it concedes is supported by the proof of loss.

10. Banco Popular de Puerto Rico is the assignee, for good and valuable consideration, of plaintiff Banco de San German to the extent of $563,402.20 of the total amount of the indemnity claimed to be due from the defendant to plaintiff Banco de San German. Accordingly, under this assignment, up to the first $563,402.20 of any recovery against defendant is payable to Banco Popular de Puerto Rico instead of Banco de San German.

11. The Excess Bond above mentioned issued on September 11, 1963, provides coverage to the insured for "any loss sustained by insured at any time but discovered during the Bond Period". The primary bond, although originally issued on June 11, 1951, to cover "losses sustained by the insured after noon of the date [t]hereof" was subsequently amended by a discovery rider issued by defendant on April 18, 1955,[4] which changed the coverage to

---

4. These dates in the pre-trial order were erroneously given as 1965 but have been changed with the agreement of counsel.

losses "sustained at any time but discovered after noon of the 18th of April 1955" ; [4] and subsequent riders to increase the limits of the coverage contain the same language, the last rider increasing the limits of the policy effective September 18, 1967, providing that it affords coverage "as to losses sustained at any time but discovered after noon of the 18th day of September 1967." [5]

12. Plaintiff Banco de San German, Inc., during all material times was a small bank located in a little town in the western part of Puerto Rico called San German. It had deposits of approximately four million dollars, capital of $500,000.00, assets and liabilities of around five million dollars, and net profits of $102,574.00 and $105,573.00 in 1965 and 1966, respectively. In 1959 Banco de San German agreed to merge with the other plaintiff, Banco Popular de Puerto Rico, which was a much larger bank. This merger was not consummated because the Treasury Department of Puerto Rico did not approve it. Neither bank, however, completely abandoned the idea of eventually making some sort of arrangement by means of which Banco Popular might participate in business in the town of San German. In early 1967 Banco de San German was interested in taking advantage of the IBM computer services offered by Banco Popular de Puerto Rico. Its president, Mr. Aurelio Tio, contacted Banco Popular with a view to obtaining the servicing of current accounts. After a study was made by officers of Banco Popular, who visited Banco de San German in early 1967, it was considered impractical to service the current accounts only and the possibility of processing all accounts and operations of the bank through Banco Popular machines was then considered. Banco Popular suggested that an audit of all the accounts of Banco de San German be made prior to the adoption of the new methods. As a result of this suggestion and, as the court infers from the evidence because of some uneasiness on the part of Mr. Tio concerning the accuracy or reliability of his bank's accounting, the latter requested Mr. Rafael Carrion, Jr., President of Banco Popular, in June, 1967, to proceed with the audit as soon as feasible. Because the auditing division of Banco Popular had a tight schedule of audits for all of its own branches, the audit of Banco de San German could not be commenced until October, 1967. The evidence is not clear when, following the June arrangements, Mr. Tio's uneasiness developed into a definite concern with respect to the financial affairs of his company. But the preponderance of the evidence has led the court to find, for reasons more particularly referred to hereafter, that before September 11, 1967, Mr. Tio had notice and knowledge that accounting for funds and credits of the bank might well bear investigation or be subject to question although no loss had been discovered and there was yet no awareness on his part of the existence or immediate danger of any substantial loss. These circumstances, as well as the increase in the assets of the bank since the last insurance increase and the forthcoming due date of the bank's insurance premiums, contributed to his decision to seek an increase of the bank's insurance coverage and to have expedited the audit of the San German bank by Banco de Popular.

13. On September 18, 1967, Mr. Tio visited the offices of Manuel San Juan Company, general agent for Maryland

---

5. Of course if plaintiffs are estopped to rely upon the September 13, 1967 endorsement, the discovery period "after noon of the 18th of April, 1955", will be reinstated; in any event I consider this particular question not determinative since I have found that the losses herein mentioned were not discovered within the contempla-

tion of the bonds before September 18, 1967, notwithstanding that the bank through Mr. Tio was aware of circumstances material to the risk which it should have disclosed to the defendant at the time it applied for the increased insurance effective that date.

Casualty Company in Puerto Rico, and requested an increase in the limits of the primary bond from $150,000.00 to $450,000.00 and later on October 3, 1967, he returned to request a raise to $750,000.00 in the limits of that bond. The primary bond offered broader coverage than the excess bond since it covered mysterious disappearance of money or property in addition to loss from dishonest acts. At Mr. Tio's request effective September 18, 1967, the coverage of the primary bond later was increased to $750,000.00.

14. On Monday, October 16, 1967, about 3 p. m., a team of twelve auditors from Banco Popular arrived without notice to employees at Banco de San German to begin the audit. This team was headed by Mr. Luis Baez, General Auditor of Banco Popular. While no losses were immediately ascertained or identified, there were irregularities noted by the auditing team which led to the belief that prompt further investigation was essential with reference, among other things, to accounts with correspondent banks. The Manager of Banco de San German, Mr. Hernan Corales, was requested to sign letters addressed to each correspondent bank where Banco de San German kept deposits on account for the purpose of clearing its checks, requesting from them a statement of the accounts of Banco de San German with them, which letters were sent.[6] The au-

ditors, Mr. Tio, and the Manager left the bank around 9:30 or 10:00 o'clock in the evening and Mr. Baez personally locked the combinations of the vault. The bank premises were then closed.

15. In the early morning hours of October 17, 1967, a fire developed at Banco de San German. As a result of said fire, various books, checks, vouchers, cards and other documents, many normally kept inside the vault, including the cash book, were found just outside the vault burned, some totally, some partially. The bank vault door was open. Mr. Baez was not permitted by the members of the Federal Bureau of Investigation and of the Federal Deposit Insurance Corporation to enter the bank's premises until about 11:00 o'clock in the morning of October 17, and his staff was not permitted to enter the premises until the next day. The audit was then continued.

16. As a result of the inquiries sent to the correspondent banks and the statements received from them it was found that there existed a shortage of approximately $1,500,000.00, between the amounts that, according to the books of Banco de San German, and specifically its Due from Banks Subsidiary Ledger, Banco de San German had on deposit in the correspondent banks, and the amounts actually on deposit at said correspondent banks. In due course of investigation it was ascertained that the

6. Defendant contends that these letters were framed in a suggestive way and that there is confusion in the record as to whether the letters were actually sent. *Any confusion stems from the fact that apparently there were two sets of letters sent, the one immediately which inquired generally as to the status of accounts, and the other later to confirm the information already obtained from the general inquiry. The last set was indeed suggestive but only of the figures the prior answers had disclosed. We see nothing to throw into question the accuracy of any of these answers.* After the court at the trial had allowed time for defendant to check with the correspondent banks and indicated that in the absence of agreement it would permit the plaintiffs to call

representatives of the correspondent banks, defendant stipulated that if responsible representatives of the correspondent banks were called they would testify in accordance with the information obtained in responses to the second set of inquiries which were received in evidence. Mr. Delgado for plaintiffs testified with reference to the first reconciliation and the second confirmation: "The usual letter is simply requesting a bank statement to make a reconciliation. Now the reconciliation had been made and these items were outstanding in the reconciliation and we wanted to double check that the correspondent banks had never received these remittances, and that is why the letters are to that effect, unusual."

shortage was $1,560,869.32, but an employee of the bank by the name of Miguel A. Sambolin confessed out of this amount to having embezzled the sum of $16,504.02 and made restitution thereof. This brought the actual shortage down to $1,544,365.30, less $400.00 which was erroneously included in the proof of loss as aforesaid.

17. Included in the amount of loss claimed is a loss of $65,088.25 from various irregularities. As hereinbefore noted, this amount less the $400.00 above mentioned, which was originally claimed in connection with an American Express Company transaction, that is, the sum of $64,688.25, defendant does not question and is willing to pay.[7]

18. Upon detailed examination and reconciliation by the auditors of Banco Popular of the statements of accounts sent by the correspondent banks, it was determined that various remittances supposedly sent by Banco de San German to its various correspondent banks, of checks and cash, were never received at said correspondent banks. The total of these remittances never received at the correspondent banks totaled $1,340,532.58. It was also determined that a number of remittances sent by the correspondent banks to Banco de San German, of checks drawn by customers of Banco de San German against their accounts in said bank, had not been credited in the Due from Banks Subsidiary Ledger although they had been debited to the customers' accounts. These remittances totaled $138,744.47.

19. The remittances which appeared from the books of Banco de San German as having been sent to the correspondent banks but never received by the latter, covered a period from September 26, 1966, the date of the earliest remittance never received by correspondent banks, until October 16, 1967, the date of the last remittance supposedly sent but never received by the correspondent banks. The remittances sent by the correspondent banks to Banco de San German, charged to its customers but never entered in the "Due from Banks" account, covered a period from April 15, 1966, to October 16, 1967.

20. The "Due from Banks Subsidiary Ledger" in which the false and misleading entries appear, and all other books and all equipment of Banco de San German, were regularly kept and used and were under the control of the employees of said bank covered by the said fidelity bonds. Both of the fidelity bonds also covered the officers of the bank within the definition of "employees".

21. Banco de San German had a general practice of microfilming every check that was received by the bank before sending it to a correspondent bank for collection and those microfilms were regularly kept in the vault. Most of these microfilms which survived the fire were illegible because of an apparent intentional over-exposure or failure to properly expose. Plaintiffs were unable to produce to defendant's accountants or at the trial any microfilm of specific checks involved in the remittances and it was impossible to determine the identity of depositors, customers or accounts involved in those remittances or to directly prove whether the checks involved in the remittances were credited or charged by the bank in the checking accounts of the customers or depositors of the bank.

22. In addition to effecting the reconciliation of the remittances sent to the correspondent banks according to the books of Banco de San German but never received by the correspondent banks according to their statements, the auditors of Banco Popular specifically requested the correspondent banks to confirm or deny that any such remittances

7. Maryland Casualty Company's experts testified that they accepted the claim for this loss because Banco de San German was able to produce "sufficient evidence" to show that the money existed in Banco de San German and mysteriously disappeared—money which had been paid by customers of the bank to the bank as installments on loans or other obligations and not credited, the customers being identified and the amounts verified with the checks that were cashed by the bank.

had been received by them; said banks answered specifically confirming that they had never received any such remittances, and the court finds from the evidence that they did not in fact receive them.[8] Whether the checks and/or money had been segregated for sending to the correspondent banks in a form for delivery to them and these funds were stolen or embezzled by one or more of the employees of the bank, or whether the funds were withdrawn from the general cash available in the bank and false remittance slips prepared to cover up the shortage in cash, cannot be determined from the evidence.

23. Nonetheless, it is reasonable to infer from the facts and circumstances in evidence, including available books of the bank kept in the regular course of business and the deficiency in assets, that the actual unauthorized diversion and embezzlement of the funds and resulting loss to the Banco de San German was in the total sum of $1,543,965.30, and the court so finds.

24. The court is of the view that to what extent the loss was to the bank immediately and to what extent directly or initially to depositors is not vital so far as concerns liability under the bonds so long as actual pecuniary loss occurs for which the bank is ultimately liable as is found to be the case here; for when assets are so lost through embezzlement of employees a real pecuniary deficiency occurs to the bank for which it is ultimately responsible whether temporarily charged back to depositors or not.[9]

25. Losses to the bank having been thus established by a preponderance of the evidence, it is doubly clear that all of them were the proximate result of dishonest, fraudulent, and criminal acts of employees of Banco de San German. The intrinsic nature of the losses, the manipulation and falsification of records, the ruthless and arrogant destruction of many other records, and the other circumstantial evidence disclosed by the record make it plain that the losses suffered by the bank were not merely accidental, mysterious or from unknown circumstances, but were the proximate result of dishonest, fraudulent, and criminal conduct of employees of the bank, to-wit, "one or more of the insured officers, clerks and other employees" of said bank "while employed in, at or by" said bank as provided in said bonds. The court further finds that said employee or employees did not include "any director of the insured oth-

---

8. *See* note 6.

9. An explanation suggested by defendant for this false and fraudulent series of entries is that some unidentified stockholders or owners—perhaps Mr. Tio—were falsely increasing the record of assets in order to be able to make a claim later on for false losses. While hardly more than inferred there is implicit in this suggestion that the Banco Popular and particularly Mr. Rafael Carrion, Jr., its president, was a party to a fraudulent scheme and that it and the audit by Banco Popular was pursuant to Mr. Carrion's long standing plan to take over Banco de San German. Inherent in this suggestion is the idea that Mr. Tio's efforts to raise the limits of the primary bond were part of this plan. While I recognize that plaintiffs' burden of proof may not be deemed diluted by even an implied obligation on the part of the defendant to suggest reasonable alternatives to plaintiffs' position, it is still the duty of the court in evaluating the effect of the circumstantial evidence to consider whether loss through embezzlement of covered employees is more probable than not. There is no basis in the evidence for any such conjecture of Tio's complicity and it is no more than that. The books were kept by the employees and there is no evidence that Mr. Tio directly or indirectly tampered with the books. It is not to be assumed, in the absence of some evidence, direct or circumstantial, that employees have made false entries for the benefit of the stockholders of the bank rather than for their own purposes. Manifestly, a choice between similarly speculative alternatives could not fulfill a plaintiff's burden of proof; but under the peculiar circumstances of this unusual case I am persuaded that the position of the plaintiffs on the issue of actual loss is supported by the preponderance of believable evidence while suggested alternatives are not.

**504**

er than one employed as a salaried, pensioned or elected official or an employee of the insured, except when performing acts coming within the scope of the usual duties of an employee", or others excluded from coverage by said bonds.

■ 26. Defendant has established by a preponderance of the evidence that Banco de San German knew in September, 1967, at the time Mr. Tio requested a raise in the limits of the primary bond, that there existed material irregularities at the bank which may have precluded the increase in the limits of the primary bond had they been disclosed to defendant by Mr. Tio when he applied for the increase from $150,000.00 to $750,000.00 in the primary bond. The court concludes that Banco de San German refrained from fully and fairly disclosing those irregularities in an effort to increase the likelihood that it could obtain increased protection for any possible loss that might be discovered arising out of these or other irregularities that might later be discovered. The court further finds that had a fair and reasonable disclosure been made to the insurance company at the time the increase was applied for it likely would not have increased the primary insurance coverage. The following circumstances have been taken into consideration by the court in arriving at the conclusion that Banco de San German had constructive knowledge of material facts which should have been disclosed to defendant when requesting a raise in the limits of its bond:

a. Mr. Tio, president of the bank, knew before September 18, 1967, that Mr. Cruz Mercado was having problems reconciling the due from banks account and had received calls from certain correspondent banks complaining of overdrawn accounts.

b. Mr. Tio suspected that substantially increased protection despite rather heavy increased cost might be important in view of questions naturally raised by his information concerning the due from banks account, since he initially requested a raise to $450,000.00 on September 18, 1967, and later obtained an increase to $750,000.00 a short time before the audit, calling a representative of the insurance company at her home at night to make sure of the increase.

c. The fire and the discovery of the loss occurred within a month after the request for the increase in the limits of the policy became effective.

d. When the request for the increase was made Mr. Tio knew that a general audit of the books and records of the bank was going to be conducted by auditors of Banco Popular because he had requested such an audit by reason of his uneasiness about the state of the bank's accounts.

e. Mr. Tio and the Board of Directors of Banco de San German had available to them a report of its auditor Mr. Celestino Morales in April, 1967, which showed as due from banks the amount of $338,000.00 and two months later they reviewed a Federal Deposit Insurance Corporation report which showed the sum of $1,100,000.00 due from banks.

f. Mr. Tio requested from the President of Banco Popular an audit of the banks and records of Banco de San German in June 1967, about the time he likely learned of the difference in the due from banks account indicated by the two audit reports.

27. While these and other circumstances indicate an awareness and natural concern of possibilities concerning the accuracy of the bank's accounts and the integrity of its employees the basis of which should have been reported to the insurance company when applying for the increase as aforesaid, the same circumstances and others connected therewith, again, seem to the court incompatible with the theory of Tio's knowledge of, or participation in, any embezzlement or falsification of bank records. It seems unlikely that since the falsification of records continued over a substantial period of time theretofore, he would have arranged for the in-

creased insurance with the urgency, at the particular time and under the particular circumstances disclosed by the evidence, if he had been a party to the falsification or embezzlement. The court believes and finds, therefore, that aside from his failure to disclose matters material to the increased risk attendant the September 18, 1967, endorsement, Mr. Tio proceeded in good faith in reliance upon the insurance company's liability. The court further believes and finds that the bank did not breach any express or implied provisions of said primary bond or excess bond by failing to report losses before it did; that the bank through Tio, or otherwise, had no knowledge or notice of the dishonest, fraudulent or unlawful acts of its employees prior to the fire, or any loss by reason thereof or mysterious disappearance of its property or funds, and had no prior duty or opportunity to report any such dishonesty, illegality or fraud or resulting losses to the insurance company as a condition of its liability under said bonds.

28. The losses herein found to have been suffered by Banco de San German were actually sustained by said bank as a proximate result of dishonest, fraudulent and criminal acts of employees of Banco de San German and discovered within the period and coverage of said bonds. It appears likely that the covered losses of the bank occurred after March 1, 1963; they were discovered within the meaning of the bonds immediately following the October 17, 1967 fire.

29. The defendant, Maryland Casualty Company, with the exception heretofore noted, at all times denied liability under the bonds, asserting that plaintiff Banco de San German, Inc., had not suf-fered any loss as claimed, that the loss claimed had not been proved, and that even if the loss had been suffered, plaintiff Banco de San German was estopped from claiming under the bonds, and particularly under the increased bond because of knowledge of malfeasance not reported to it. While the court is convinced, by a preponderance of the evidence, as it believes, that the claimed loss occurred substantially as asserted by plaintiffs and that there was no breach of the bonds by plaintiffs because of knowledge of malfeasance not reported by plaintiffs, the court also must be mindful that the sufficiency of the proof of said loss is arguable, and that it has been concluded that the plaintiffs are estopped from relying upon the increase in the primary bond obtained as of September 18, 1967, because of failure to report circumstances material to the risk; in view of all the circumstances the failure of the insurance company to voluntarily settle with the plaintiffs prior to trial was not obstinate or patently unreasonable on the basis of the facts known by the insurance company up to the time of the trial.

From the foregoing Findings of Fact, the court now makes and enters the following:

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter of the action, being for a claim in excess of $10,000.00 exclusive of interest and costs, and over the parties, as to whom diversity of citizenship exists.

2. The insurance policies involved here are contracts of indemnity on which the insurer is liable only in the event of pecuniary loss.[10]

---

10. It has been held that to recover under a bond indemnifying a bank against loss sustained through the dishonesty of its employees it is necessary to show that an actual loss was sustained, as distinguished from a theoretical or bookkeeping loss. First National Bank of Temple v. Continental Casualty Co., 133 F.2d 197, 198 (5th Cir.), cert. denied, 313 U.S. 575, 61 S.Ct. 1087, 85 L.Ed. 1533 (1943); Continental Casualty Co. v. First National Bank of Temple, 116 F.2d 885, 887 (5th Cir. 1941); First National Bank of Temple v. Continental Casualty Co., 100 F.2d 308, 310 (5th Cir. 1938).

3. Plaintiffs have the burden of establishing that loss by a preponderance of the evidence.

4. If loss is proved within the coverage of said bonds the time the loss occurred is not determinative on the question of liability so long as discovery of such loss was made within the periods specified in the policy. The losses involved here were discovered within the period covered by said policies.

5. The real problem in this case is whether the evidence sufficiently establishes that an actual pecuniary loss was suffered by the bank or whether the loss indicated by the available books is a mere bookkeeping imbalance without actual pecuniary loss to the bank. Here I believe the fair preponderance of the evidence establishes the loss. It cannot be said that proof as to this loss is beyond a reasonable doubt or even clear and convincing beyond the preponderate evidence of such loss, but it is established by a preponderance of the evidence and by the best type of evidence of which the nature of the case is susceptible in view of the destruction of the records. It could be argued that any fact so established by a fair preponderance of the evidence appears clearly and convincingly. I believe that the preponderance of the evidence so appears. To say that beyond so preponderating in favor of plaintiffs in this sense, however, the loss is established clearly and convincingly or beyond substantial doubt is something else which I am not prepared to find. I believe the defendant as a paid insurer is not insulated from performance of its contract by an anymore difficult burden

of proof on the part of plaintiffs than that of preponderance of the evidence since plaintiffs are not asking for any equitable remedy of reformation or avoidance but only to be made whole under the terms of unquestioned contracts.[11]

■ 6. The court so concludes that there was a loss established by the preponderance of the evidence, direct and circumstantial, substantially as claimed by plaintiffs. Neither the fact that the specific items could not be identified, nor the fact that the evidence does not show whether any diverted checks were charged back to customers' accounts is fatal to plaintiffs' case. The bank is ultimately responsible for the embezzlement of its employees notwithstanding temporary credit or debit adjustments and had no obligation of exhausting any supposed remedies against depositors. Fitchburg Savings Bank v. Massachusetts Bonding & Ins. Co., 274 Mass. 135, 174 N.E. 324, 74 A.L.R. 274 (1931). In addition to other circumstances, there is testimony from the admitted deposition of Rafael Carrion, Jr., President of Banco Popular, that when the October, 1967, audit was completed it became evident that Banco de San German's capital funds were for all purposes wiped out. It is clear that in the dealings between the two banks involving a substantial loan to permit the meeting of commitments this was the assumption and the evidence has convinced the court that the dealings between the banks were not a mere subterfuge but were based upon the genuine acceptance that there had been an approximate $1,500,000.00 loss.

---

11. It seems unnecessary to dwell on the refinements whether clear and convincing evidence is any different in burden than preponderate evidence, see Boone v. Royal Indemnity Company, 460 F.2d 26 (10th Cir. 1972), or is a special burden of proof by "a fair preponderance clear and convincing", General Finance Corp. v. Fidelity and Cas. Co. of New York, 439 F.2d 981 (8th Cir. 1971), or whether the "clear and convincing" standard is pertinent at all to situations where purely legal rather than equitable relief is sought

on the ground of fraud, Amsden Lumber Co. v. American Surety Co., 127 Kan. 469, 274 P. 203, 62 A.L.R. 1446 (1929). *See also* United States v. Maxwell, Land-Grant Co., 121 U.S. 325, 381, 7 S.Ct. 1015, 30 L.Ed. 949 (1887). The question of whether there was a loss to the bank through some means clearly should be provable by a fair preponderance. The question of whether any loss occurred through fraud I believe is met by sufficient evidence notwithstanding the burden of proof applied.

The experts for the insurance company sought to justify denial of the claim on the ground that irrespective of whether a loss actually occurred the "evidence of the loss" was not sufficient in their judgment.[12] But the court's problem as indicated is not to determine whether the evidence was sufficient to satisfy the insurance company but whether the fair preponderance of the evidence establishes that the pecuniary loss claimed actually occurred.[13] I have studied the view of the experts and all other evidence in the case and it does so appear to me.

7. The loss having been thus established, the court can and does readily conclude that it proximately resulted from the criminal, fraudulent and dishonest acts of employees covered by the bond, notwithstanding authorities relied upon by defendant.[14] While fraud is

12. "The only way to determine whether that actually took place or not is for me to be able to see the documents that give rise to that increase (in the assets represented by the due from banks account according to the bank books) and they are not available." (Mr. Kearly.)

\* \* \* \*

"Q. You say there were no erroneous entries, no attempt to falsify records. Is that correct?

"A. I did not say that.

"Q. I have it in my notes as you having said it, but I will not insist upon it. What did you say then with regard to that?

"A. I said there was no evidence given to us of an attempt to make erroneous entries.

"Q. That means there was no erroneous entries?

"A. No, I didn't say that. The two are not synonymous.

"Q. Unless you limit yourself to the evidence presented to you, that's why you are making the distinction.

"A. Yes, I am limiting it to the evidence I have seen and heard." (Mr. Shafer.)

13. The decisions cited in note 10, *supra*, strongly relied upon by defendant, were filed in three different appeals to the circuit court in the same case. The decisions were reached on facts significantly different from those of the present case. They involved a bank which sold its assets to a new bank. The new bank assumed all existing liabilities of the old bank. Continental Casualty Co. issued and delivered its bankers blanket bond to the new bank. The new bank later claimed indemnity under the previous bond. The evidence disclosed that the employees during the operations of both the old and the new banks, having previously withdrawn funds from the accounts of customers used the moneys received when subsequent withdrawals had been previously made. All the deposit slips were held from the records of the bank so that the books would balance. Such new deposits only served to cover up the previous withdrawals and the liability of the bank remained the same, being simply a switch from the old to the new depositors. Under such facts it is clear that no new liability arose at the time of the switch. The moneys received by the bank from depositors actually went into the bank to cover previous shortages, and, therefore, it did not appear that the bank suffered diminution of its assets during the period covered by the bond. Dean v. Fidelity & Deposit Co. of Maryland, 233 App.Div. 392, 253 N.Y.S. 103 (1931), also is a case where the time of the embezzlement rather than its discovery was critical and not sufficiently shown. Other cases relied upon by defendant to show that the loss here was a "mere bookkeeping loss" rather than an actual one are either not sufficiently in point to be persuasive or adopt an excessively strict and peculiar rule as to the sufficiency of proof against insurance companies with which I do not agree.

14. In the case of American Employers' Insurance Co. v. Roundup Coal Mining Co., 8 Cir., 73 F.2d 592, 595, the court included, as *dicta*, the following language which defendant relies on:

"But, even if it had been proven that the books were incorrect as claimed, this would not have proved that Bunker appropriated or embezzled the difference. It is argued that defendant's bond insured against Bunker's dishonesty, but the mere fact that he may have been dishonest is not a sufficient basis for recovery. Dishonesty in the abstract cannot be compensated in damages, and in a suit to recover on the bond the dishonesty must have resulted in pecuniary loss."

The opinion in this case demonstrates, however, that the court was concerned primarily with a point of evidence with reference to letters sent by customers to the coal company. It was noted that the

never presumed, if it had to be established by direct evidence perhaps most fraudulent schemes could be conducted with little fear of accountability in the courts; it is quite usual and often necessary for fraud to be proved through circumstantial evidence. Here the circumstances not only preponderate to establish fraud, dishonesty and illegality of any loss but are clear and convincing no matter what standard of proof may be applied. *Cf.* General Finance Corp. v. Fidelity & Cas. Co. of New York, 439 F.2d 931 (8th Cir. 1971). As to proof of the amount of the loss the best evidence which the circumstances of the case permitted seems to have been resorted to, and tested by the adversary proceedings. It is difficult to find precedents in such a case as this where the very enormity of the fraud included the wholesale destruction of original records but left the type of book entries kept in the usual course of business on which businesses are from day to day run, official examinations are made, and sales of businesses, as here, accomplished. But the loss as a result of dishonesty having been established, a mechanical, grudging or rigid application of statements in cases involving usual circumstances and more available means does not seem indispensable here in determining the precise amount, so long as the fundamental burden of preponderance of the evidence is applied and a fair approximation thereby arrived at in accordance with the general rule. *See* Prior Lake State Bank v. National Surety Corp., 248 Minn. 383, 80 N.W.2d 612, 57 A.L.R.2d 1306; Leader Clothing Co. v. Fidelity & Casualty Co. of New York, 237 F.2d 7 (10th Cir. 1956).

8. In my judgment the proof, including reasonable inferences to be drawn from the direct evidence, renders it most probable that the claimed diversion of the assets of the bank was made through the dishonest, illegal and fraudulent conduct of employees, including the manager of the bank, and that when the shortages were about to be discovered in October, 1967, there was utilized a ruthless destruction and burning of records to avoid or complicate proof of the violation as against the perpetrators. Whether such concealment and destruction has or will preclude proof beyond a reasonable doubt in the criminal proceedings which the record indicates are pending against the manager does not affect the right of recovery by plaintiffs against the insurance company if resultant pecuniary loss to Banco de San German is shown by a preponderance of the evidence. The apparent difficulty of proving a case against the manager in the criminal proceeding beyond a reasonable doubt indicates only that what on the surface may have appeared to be merely a transparent and desperate subterfuge, in reality may have held realistic chances of success as against criminal charges. The court cannot dismiss plaintiffs' case as based upon some excessively dramatic and unbelievable events when the most unusual and unbelievable of these were failure to properly expose the original microfilms of the checks, the ruthless and bizarre extraction from the locked vault of the original records and the burning of most of the original records and their reproductions to the extent retained—facts which cannot be questioned by anyone. Thus the highly unusual nature of these may not reasonably be employed to hide the more usual and natural consequences and inferences which are also part of the fabric of this case. These circumstances, consequences and inferences do not lie in the realm of negligence or mere error of judgment but carry inherent badges of fraud and dishonesty.[15]

---

records of the customers were not produced or identified and that there was no testimony that the compilation was correct; that therefore the document was objectionable as hearsay. In the present case the letters from the correspondent banks were admitted pursuant to stipulation of the parties that their responsible officials would testify to the same effect.

15. Compare such cases as New Mexico Savings & Loan Association v. United States

9. However close the controlling question may be, my judgment tells me after listening to and observing the witnesses, studying the documentary evidence and reviewing the transcript that the findings and conclusions here arrived at are on balance correct and that it would fly in the face of justice to disregard them. There is, however, some reassurance from the fact that as one of the parties has already suggested, my decision whatever it may be will be subject to review in the Court of Appeals; it is to be hoped at least that this trial disposition, no matter what view that court may take on the sufficiency of the evidence, will permit a final determination by it without the necessity of retrial of this astonishing case which already has been pending too long.

■■ 10. Having found that Banco de San German had suspicion or notice of irregularities which should have been reported to defendant when a request for the raise in the limits of the policy was made, the court rules as a conclusion of law that plaintiffs are estopped to recover any amount over $150,000.00 under the coverage of the primary bond. This serves, in effect, however, to reinstate the existing primary coverage of $150,000.00 in lieu of $750,000.00, and entitles the plaintiffs to recovery under the primary bond in the sum of $150,000.00 and under the excess bond in the sum of $1,000,000.00, and hence under both bonds in the total sum of $1,150,000.00 for the loss established substantially in excess of that amount. The court further concludes that the facts giving rise to the estoppel aforesaid do not estop or bar plaintiffs from recovery on said bonds as they existed immediately prior to the increases of the

primary bond on September 18, 1967. In this connection, it is important to distinguish between circumstances or suspicions material to the increased risk which in equity and good conscience should have been reported to the insurance company as a condition to the obtaining of increased insurance and notice of knowledge of losses or unlawful, fraudulent or dishonest acts the concealment of which might breach express or implied conditions of the bonds; the court concludes that there was no concealment of the latter nature. This basic distinction is appropriately drawn in such cases as United States Fidelity & Guar. Co. v. Commercial Nat'l Bank, 62 F.2d 718 (5th Cir. 1933). *Cf.* United States Fidelity & Guar. Co. v. Empire State Bank, 448 F.2d 360 (8th Cir. 1971). The case relied upon by defendant to justify denial of all recovery in its last (reply) memorandum, Parker v. Sprague, 193 Wis. 338, 214 N.W. 361 (1927), is clearly inapposite.

■ 11. The local rule is that where a party has been obstinate the court shall in its judgment impose on such party the payment of a sum for attorney's fees.[16] However, because of the closeness of the question of loss, the success of the insurer in establishing an estoppel against reliance upon the October, 1967, increase in the primary bond and its tender of payment of the amount concerning which there were no grounds for substantial question, failure to pay plaintiffs' claim was not obstinate or "temerary" and does not warrant the award of attorney's fees against the defendant.

12. Judgment should be entered in favor of plaintiffs and against defendant for a total of $1,150,000.00 as fol-

Fidelity and Guaranty Company, 454 F.2d 328 (10th Cir. 1972), wherein the bonding company prevailed on a record wholly consistent with honest judgment, however erroneous or misguided.

16. The statute provides for a special award when, on the entire case, or a particular issue, a party has, with regard to an issue of law or fact, unreasonably maintained a position. In such event it has been held that the award of attorney's fees is mandatory. Montanez v. Metropolitan Construction Corp., 87 P.R.R. 35 (1962). This rule has been recognized in the federal courts as a matter of substantive right. Pan American World Airways, Inc. v. Ramos, 357 F.2d 341 (1st Cir. 1966).

lows: $563,402.20 for plaintiff Banco Popular de Puerto Rico and $586,597.80 for plaintiff Banco de San German. Interest shall also be payable to each plaintiff on the judgment, according to the terms of the bonds, from April 4, 1968, the date the Proof of Loss was submitted to defendant, until date of judgment at the rate of 6% per annum, the judgment after entry to bear interest at the rate provided by law until paid. Costs, not including attorney's fees, shall be assessed against defendant.