**ESSEX COUNTY STATE BANK, a Banking corporation, chartered by the State of New Jersey, Plaintiff,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, a corporation of the State of California, and Aetna Casualty and Surety Company, a corporation of the State of Connecticut, Defendants.**

**AETNA CASUALTY AND SURETY COMPANY, a corporation of the State of Connecticut, and Fireman's Fund Insurance Company, Defendants-Third-Party Plaintiff,**

v.

**Kenneth B. WINTERS, Third-Party Defendant.**

**Civ. No. 396–69.**

United States District Court, D. New Jersey.

Sept. 23, 1971.

932

Teltser & Greenberg, by Philip Freedman, East Orange, N. J., for plaintiff.

Gleeson, Hansen & Pantages by Alastair J. Sellar, Newark, N. J., for defendant Fireman's Fund Ins. Co.

Lum Biunno & Tompkins by Raymond W. Troy, Newark, N. J., for defendant Aetna Casualty.

Cerrato & O'Connor, by Richard O'Connor, Freehold, N. J., for third-party defendant Kenneth Winters.

## MEMORANDUM OPINION

LACEY, District Judge:

Plaintiff, Essex County State Bank (Bank), a New Jersey banking corporation, sues Fireman's Fund Insurance Company (Fireman's), a California corporation, and The Aetna Casualty and Surety Company (Aetna), a Connecticut corporation, on a "Bankers Blanket Bond." Originally brought in state court, this diversity action was removed to this Court. 28 U.S.C. § 1441; 28 U.S.C. § 1332. Trial herein was had without a jury on September 16 and 17, 1971. This Memorandum Opinion constitutes this Court's Findings of Fact and Conclusions of Law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### FACTUAL BACKGROUND

Mr. Kenneth B. Winters (Winters) became president and a director of the Bank on March 3, 1965. His duties, authority, and responsibility were broadly defined by letter to him of that date, over the signature of the Bank's Board Chairman, Mr. Murray R. Klepesch (Klepesch), drafted by the Bank's counsel, Mr. Arnold R. Kent (Kent), also a director and secretary of the Bank. The letter conferred upon Winters, unconditionally and without restriction, unsecured loan authority up to $25,000, subject only, as the evidence was later to demonstrate, to the requirement that such loans when made would be subsequently presented for Board review.[1]

On September 19, 1966, Winters granted a $25,000 loan to Mr. Martin Pinnas (Pinnas), of which the Bank was subsequently only able to recover $10,000. The Bank's claim in this action is that Winters made this loan in direct violation of explicit Board instructions and it was therefore a "dishonest" act under defendants' fidelity bonds, both of which cover (Insuring Clause A):[2]

Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees.

Defendants deny that the Pinnas loan was a "dishonest" act under their policies, argue that it was within Winters' authority, and interpose as well the affirmative defenses of plaintiff's failure to comply with bond requirements of notice and time limitations for instituting suit.[3] The defendant Fireman's also contends that "discovery of loss" occurred after the expiration of its bond which ran from 1964 to January 31, 1967, and that it is "discovery of loss" which is the critical event, rather than when the alleged "dishonest" act was committed. The defendant Aetna asserts the corollary proposition, that the "dishonest" act did not occur within the term of its bond which began February 1, 1967; and that the plaintiff, as of February 1, 1967, having had sufficient knowledge of the basic facts comprising the instant claim, that is, a loan in violation of Board instructions, was obliged under the bond to call to Aetna's attention the existence of these facts in its

---

1. The letter also provided: "You will be chief operating officer of the bank with complete authority to make all decisions regarding bank operations and investments * * *."

2. The Amended Complaint claimed a loss of $15,000 on the Pinnas loan and $1,500 on a loan to a Sol Weber (Weber), an employee of Pinnas, made October 4, 1966, both made or arranged by Winters "in a course of dishonest conduct in collusion with" Pinnas. (¶¶ 4–5). The Weber loan was ultimately collected but, as will hereinafter appear, the Bank tenders the very making of the loan as supportive of its claim on the Pinnas loan.

3. Each defendant's bond requires "written notice" at "the earliest practicable moment after discovery of any loss"; "within six months after such discovery * * * affirmative proof of loss with full particulars" and suit not "after the expiration of twenty-four months from the discovery of such loss." (*See* Aetna's Third Separate Defense for full text of § 3 of bond setting forth these conditions.)

bond application. Moreover, Aetna contends, the Bank's omission in this respect served to cancel Aetna's bond.

The defendants have each filed third-party indemnity claims against Winters. Winters has responded that he acted within his authority and denies any dishonest conduct or collusion with Pinnas.

The controversy can thus be distilled to this principal question: Was the Pinnas loan knowingly made by Winters in direct violation of orders of the Board of Directors? The plaintiff states it was, and thus was a "dishonest" act. Defendants and Winters contend to the contrary. As a subsidiary question, plaintiff's counsel assumed at trial an added burden to justify his cross examination of Winters: That plaintiff had to show (and would prove) that Winters knew when he granted the Pinnas loan that he was acting contrary to the Bank's best interests.

Kent testified for the Bank on the "dishonest" act issue. He stated that at a Board meeting prior to September 19, 1966, at a time he was unable to approximate, certain names were discussed as possible additions to the Board. The Board Chairman (Klepesch) proposed Pinnas. Certain unidentified directors were critical of Pinnas' financial stability, however, and his name was rejected, and in this context, according to Kent, the Board told Winters not to extend a loan to Pinnas. This injunction was not recorded in the minutes; however, Kent explained this away by indicating that the entire discussion took place during an informal session after a regular Board meeting. At the time of this meeting Pinnas had no relationship with the Bank, and the Bank's directors had no knowledge or reason leading them to believe Pinnas would ever apply to the Bank for a loan.[4]

Winters confirmed that several months prior to September 19, 1966, a discussion occurred, at a Board meeting, of possible new directors, that Pinnas' name had been proposed, unfavorably received, and rejected; but he flatly denied receipt of orders from the Board not to extend credit to Pinnas.[5] Winters did not know Pinnas at this time. Subsequently he met him through Klepesch; and thereafter, and prior to September 19, 1966, Pinnas had brought certain accounts to the bank. The $25,-000 loan in question was applied for by Pinnas on September 19, 1966, and granted by Winters after a credit investigation. Plaintiff faults this investigation but does not go so far as to contend that the issue of Board instructions aside, the loan transaction thereby became a "dishonest" act. The investigative materials were all incorporated in the accessible loan file; the majority of banks contacted commented favorably upon Pinnas; there is no suggestion that Winters concealed or falsified data, acted fraudulently, or personally profited from the loan; and in all respects his investigative product was available for Board review when he proceeded subsequently to notify the Board of the loan.

4. The parties stipulated that another director, if called, would have supported Kent's version of the critical events. This other witness was, at the times involved in this litigation, Kent's law partner, and their firm was the Bank's counsel. One of their associates wrote on the Bank's behalf a letter, on September 11, 1967 (Ex. DF–3), purporting to quote the directors as to what happened at this pre-September 19, 1966, meeting. The letter is inconsistent with the testimony at trial.

5. It must be noted that in order to come under the bond's "dishonest" act provision, the Bank goes beyond merely contending that Winters was advised of Pinnas' financial instability, or his poor credit standing; and the Bank's position is well beyond a mere suggestion, or advice, or even implication, from one or more Board members to Winters, that a loan to Pinnas would be fraught with risk. On the other hand, the Bank does not now contend, as did its counsel prior to suit, that the Board had disapproved Pinnas' loan application, only to have Winters approve it (Ex. DF–3).

When the Board, consistent with routine procedures, was on October 4, 1966, notified by Winters of the loan, it instructed him to recover it immediately. ($10,000 had been repaid by the time Winters left the Bank in March, 1967). The Bank advanced testimony that the directors at the meeting were upset because Winters had violated their instructions.[6] Winters denied any reference having been made by the Board at this meeting to previous instructions. Contrary to what would be reasonable to expect, given the alleged egregious violation of Board instructions, there is no recordation of this alleged violation of orders in the minutes of this meeting. Winters, it is noted, did nothing to conceal having made the loan: On the contrary, everything about it was presented to the Board in the ordinary course, and plaintiff's Pre-Trial Contentions in this regard (non-disclosure of the loan), were not only not proved, they were abandoned. The directors at the time had complete access to the loan file, but there is nothing to indicate that the Board was moved by the events of the meeting to call for its production or review. Similarly, there is no evidence that the Bank at this point in time was critical of the investigation conducted by Winters.

Finally, auditors reviewed the Pinnas loan transaction in March, 1967, and there is no evidence they found any fault with Winters' investigative procedures or with the loan itself. The auditors were told there was a "claim pending," necessarily a reference to a civil suit against Pinnas, since the bond claims still were many months away from being asserted.

Far from being critical of Winters for an alleged violation of Board instructions, the Board minutes reflect Board satisfaction with and praise of Winters' performance in handling the Bank's portfolio (Minutes of October 18, 1966). While not related directly to the narrow specifics of commercial loan activity, this Board action shortly after the Pinnas loan was disclosed is inconsistent with the normal attitude that would follow a direct violation of orders, underscored by the fact that the praise was extended by a director who also served as counsel to the Bank. Additionally, on November 1, 1966, the Board formed a Financing Committee and it included Winters. The minutes indicated the confidence reposed in him: " * * * said committee would generally review loans both contemplated and outstanding at the request of the President * * *." The Board minutes of November 16, 1966, reflect a $2,500 per annum salary increase for Winters, retroactive to November 1, 1966. Winters then presumably served uneventfully until he resigned on February 23, 1967, effective March 10, 1967.

The Bank does not contend that his departure was in any way connected with the Pinnas loan.

Winters was replaced by Mr. Leonard Baumann (Baumann), who investigated the Pinnas loan but found nothing more than had been available to the Board on October 11, 1966; and the Board on April 4, 1967, directed him to refer the matter to counsel. Baumann also uncovered a loan to one Sol Weber, a Pinnas employee, made with Winters' approval on October 4, 1966.[7] It is the Bank's

---

6. The Bank's witness had testified that at this Board meeting Winters was chastised for violating Board orders. He could not recall what Winters said in response. The significance in this is that even assuming the Board had orally given such instructions to Winters, there is no testimony he heard the instructions or that, if he heard them, he recalled them when the loan was made. The Board offered

no evidence that Winters ever acknowledged at any time receiving such instructions.

7. The Stipulation of Facts provided (Ex. C–1, ¶ 6):
   6. On October 4, 1966, a loan in the amount of $1500.00 was made by the bank to Sol Weber, an employee of Pinnas. The loan was made by issuance of a check in the amount of $1200.00,

theory that the Weber loan transaction can be translated into signifying, when combined with the Pinnas loan, a "course of dishonest conduct" by Winters, "in collusion with" Pinnas. The Bank contends that the Weber loan, requested by Pinnas, and used to pay off Weber's loan to Pinnas, came after Winters had been told not to deal with Pinnas and, indeed, after he had reported the Pinnas loan to the Board which directed it be recalled. Winters disputes this, stating that the Pinnas loan had been presented to the Board on October 4, 1966, the same day as the Weber loan. Even if this dispute were resolved in the Bank's favor, however, the Bank's position would not be necessarily enhanced, because, as must be kept in mind, the Bank has no cause of action if Winters did not violate Board instructions. There is nothing in the Weber transaction which indicates Winters received such instructions.[8]

Because Winters approved the Weber loan, requested by Pinnas, and because the loan application indicates the proceeds were to repay $1200 to Pinnas, the Bank contends that, when these facts were brought to its attention, and its counsel aggregated these facts with the Pinnas loan, it had for the first time an awareness that it had sustained a loss in the Pinnas transaction which constituted a "dishonest" act.

It was Baumann as president who accumulated these facts and perceived their alleged interrelationship. He directed the Bank's counsel on April 11, 1967, to collect the Pinnas loan after having taken similar steps in March, 1967, on the Weber loan. The action thereafter taken was fully successful with Weber, only partially successful with Pinnas.

It was not until December 15, 1967, and January 11, 1968, that notices of possible claims were made by the Bank to the defendants, Fireman's and Aetna, respectively. The notice to Aetna falsely states that "on or about July 1, 1967, we submitted a formal claim to the Fireman's Fund Insurance Companies * * *".[9] Actually, the first notice to Fireman's was, as indicated, December 15, 1967.

Both companies denied liability.

## THE LAW

▮ At issue here is the meaning of "dishonesty" in the insurance contract between the parties. The substantive law of New Jersey applies in this diversity case, involving as it does the interpretation of and the recovery upon an

---

certified by the Essex County State Bank and payable to Martin Pinnas and was issued prior to the deposit of funds in Weber's new account. The first entry on Weber's loan account is an overdraft. In March of 1967, the Weber loan was referred to counsel for collection and after judgment and execution thereon, was collected in full.

8. As will hereinafter appear, the view this Court takes of the Weber loan and subsequent events makes it unnecessary to relate all the details of this loan and the testimonial conflicts on it between Winters and Mr. Thomas J. Bader, an assistant vice-president of the Bank at the time the loan was granted. It is determined that even with it added to the Pinnas transaction, plaintiff has not sustained its burden of proving that Winters knowingly conducted himself contrary to the Bank's best interests, a burden assumed by plaintiff's counsel during the trial to explain and justify his going into the Weber transaction. As has been stated, the Weber loan was repaid, although not without some inconvenience to the Bank.

9. The Stipulation of Facts provided (Ex. C-1, ¶¶ 13-14):
   13. On December 15, 1967, Steven S. Radin of Cummis, Kent & Radin, Esqs. wrote a letter to J. A. Clark & Sons, Inc., agents for Fireman's Fund Insurance Co., putting that company on notice of a possible claim within the coverage afforded by the bond and advising them to contact Leonard Baumann for details. This is the first notice of claim to Fireman's Insurance Co.
   14. On January 11, 1968, notice was sent to Aetna Casualty & Surety Co. concerning a possible claim under its bond.

insurance contract delivered and to be performed in New Jersey. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *and see* American National Bank, etc. v. Hartford Acc. & Ind., 442 F.2d 995, 996 (6 Cir. 1971). *See also* Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 492–493, 170 A.2d 22, 31–32 (1961); Restatement (Second) of Conflict of Laws, § 193 (1971).

Looking first to general principles, the Supreme Court recently reiterated in United States v. Seckinger, 397 U.S. 203, 216, 90 S.Ct. 880, 888, 25 L.Ed.2d 224 (1970), the familiar doctrine that when ambiguous a contract "should be construed less favorably to that party which selected the contractual language." This canon of construction has not infrequently been applied to insurance policies. American Surety Co. v. Pauly, 170 U.S. 133, 144, 18 S.Ct. 552, 42 L.Ed. 977 (1898); Imperial Ins., Inc. v. Employers' Liability Assurance Corp., Ltd., 442 F.2d 1197 (D.C.Cir. 1970); Hunt v. Hospital Service Plan of New Jersey, 33 N.J. 98, 162 A.2d 561 (1961); Schneider v. New Amsterdam Cas. Co., 22 N.J.Super. 238, 242, 92 A.2d 66, 68 (App.Div. 1952).

On the other hand, a court may not rewrite a contract when the language employed is free of doubt. Baltimore Bank & Trust Co. v. United States Fidelity & Guaranty Co., 436 F.2d 743, 746 (8 Cir. 1971); Scheinman v. Phoenix Mutual Life Ins. Co., 409 F.2d 999, 1001 (7 Cir. 1969); Taylor v. New York Life Ins. Co., 324 F.2d 768, 771 (10 Cir. 1963); Mofrad v. New York Life Ins. Co., 206 F.2d 491, 493 (10 Cir. 1953); Novellino v. Life Ins. Co. of North America, 216 A.2d 420, 422 (Del.1966).

Turning to New Jersey, and narrowing our focus to insurance contracts providing indemnity bond coverage, Mortgage Corporation of New Jersey v. Aetna Casualty & Surety Co., 19 N.J. 30, 115 A.2d 43 (1955), provides us with the requisite guidelines. Plaintiff therein, a mortgage company, having agreed to make a construction loan to a builder of houses, employed an inspector (Harrison) to inspect the houses personally and to certify to it completion of each of several stages of construction so that it could make payments to the builder in accordance with the mortgage agreement. The inspector thereafter furnished false certificates, certifying to inspections never made, and the mortgage company suffered loss. The fidelity bond then sued upon was identical to that in the case at bar. A jury verdict was returned for the defendant, but the trial judge entered judgment n. o. v. and on appeal his determination was upheld.

Writing for the New Jersey Supreme Court, Justice Jacobs established certain broad principles: (1) Fidelity bonds "indemnifying employers against dishonest acts of their employees are to be broadly construed." *See also* Reese Cadillac Corp. v. Glens Falls Ins. Co., 59 N.J.Super. 118, 157 A.2d 331 (App.Div.1960). (2) Such bonds "evidence the clear intent to protect the employer against employees' wrongful acts which, though not criminal, nevertheless display significant lack of probity, integrity or trustworthiness." *See also* Boston Securities, Inc. v. United Bonding Ins. Co., 441 F.2d 1302 (8 Cir. 1971). (3) "The absence of any motive of personal profit or gain does not establish that the wrongful act of the employee was not dishonest." (4) Evidence of "mere neglect or incompetence would not bring the matter within the coverage of a bond indemnifying against dishonest acts of employee." *See also* Imperial Ins., Inc. v. Employers' Liability Assurance Corp., 442 F.2d 1197 (D. C.Cir. 1970). (5) The words "fraud and dishonesty" as used in fidelity bonds are to be given broad signification and taken most strongly against the surety company. (6) The question of whether a particular act or series of acts is "dishonesty" under a fidelity bond is to be submitted to a jury except "where the court finds that the facts are uncontroverted and reasonably permit of but a single conclusion it becomes its duty to direct a judgment in accordance with its

own interpretation of the bond coverage."

The foregoing principles were announced against a factual background best set forth in Justice Jacobs' own words (19 N.J. at 40, 115 A.2d at 48):

> \* \* \* We are not dealing with an instance of neglect, mistake or incompetence; nor are we dealing with an isolated inadvertent or insignificant delinquency by an employee. What Harrison did was done willfully and was continued over a period of four months. On 92 occasions he certified that he had made personal inspections when he knew that such certifications were false and that his employer, being unaware of their falsity, would disburse large sums in reliance thereon. He deliberately failed to tell his employer that he was not making personal inspections because he was afraid he would lose his job; and this though he knew that the very purpose for which he was hired as inspector was to make personal inspections and to issue his certifications on the basis thereof. Under the admitted facts he palpably was faithless to his trust and deceived his employer; it matters not that his conscious deceptions may not have been accompanied by intent to cause actual monetary loss to his employer and may have been induced by motives of personal comfort or convenience rather than personal profit or gain for, in any event, his conduct was morally as well as legally wrongful. In the light of all of the foregoing we are convinced that Harrison's misconduct must fairly be held to be the type of action which fell within the reasonable and proper coverage expectations of the parties to the fidelity bond issued by the defendant to the plaintiff.

*See also* General Finance Corp., etc. v. Fidelity & Casualty Co. of New York, 439 F.2d 981 (8 Cir. 1971) (opinion by Honorable Tom C. Clark, Retired Associate Justice of the United States Supreme Court, sitting by special designation); Oklahoma Morris Plan Co. v. Security Mutual Casualty Co., 323 F.Supp. 1057 (E.D.Mo.1970).

## DISCUSSION

█ Putting aside momentarily the issue of whether Winters violated Board instructions, and considering simply the Pinnas loan transaction on its own, I find that what was done—or omitted— by Winters did not separately or cumulatively constitute a "dishonest" act. At most, and affording plaintiff every reasonable inference it seeks to draw from the transaction itself, there is presented nothing more than an act of negligence, or poor business judgment.

I have considered the evidence relating to the Weber loan. I find that the facts of this transaction do not, by themselves or when combined with the Pinnas loan, permit the conclusion that Winters entered into a "collusive" course of conduct with Pinnas. The Weber loan was of course repaid, though concededly only at some inconvenience to the Bank.

█ Introducing now plaintiff's claim that Winters' conduct was "dishonest" because it violated orders, I am not persuaded that, even if plaintiff's version of this disputed issue were accepted, it would compel the conclusion of "dishonesty" under the circumstances of this case. An "order" is not an absolute. It has various shades of meaning and can be issued with varying emphasis. There is abundant evidence here that the directors themselves did not view with gravity the alleged violation of their directive. On the contrary, their treatment of Winters after October 4, 1966, when he reported the loan, reflects satisfaction with his overall performance. Thus one could readily find and I do so find that, even if there was a violation of orders, it was within a framework of circumstances making it non-culpable and short of being "dishonest."

More than that, however, I draw from the Board's post-October 4, 1966, relationship with Winters, and the other

facts and circumstances of this case to which I shall refer, the substance for my finding that Winters received no such orders or instructions as are alleged to have been given.

This finding is based upon not only my appraisal of the attitude and demeanor of the witnesses concerned and their manner of answering questions in the critical factual area. It is based as well upon associated facts and circumstances, all of which together support Winters' testimony.

When Pinnas' name was proposed as a director and rejected, there would have been no reason for the directors to have acted as a Board to direct Winters not to loan him any money. There was no indication at that time that Pinnas would in the future apply for a loan. Moreover, there was no reflection in the Board minutes of this limitation. Kent,

who as secretary prepared the minutes, could only offer as a reason for this omission that the discussion may have taken place in an informal session after a regular Board meeting, but he was unable to even approximate the date of this meeting. It is clear that there was not in this case a loan application by Pinnas rejected by the Board and thereafter approved by Winters. Yet Kent's law firm, as plaintiff's counsel, wrote to Winters that this was what had happened.[10]

Nothing has been disclosed which would indicate why Winters would have knowingly violated such alleged orders. He had nothing to gain, he could only lose. Following the granting of the loan, he brought it up for Board review as a routine matter and did nothing in the way of concealment or altering of records to suggest such consciousness of

---

10. *See* Ex.DF-3—letter from Kent's firm to Winters, September 11, 1967:

> The Bank is also faced with a collection problem on the original $25,000.-00 loan made to Martin Pinnas, which was reduced to $15,000.00, and upon default of same, the Bank has obtained judgment which at the moment appears to be uncollectible.
>
> We are advised by the Board of Directors that this loan was not approved by the Board, *and in fact, at a prior Board meeting when an application for Mr. Pinnas was presented, there was a reaction from the Board, in general declining same and advising that it not be entertained.*
>
> We will again appreciate your aid in advising the circumstances of that loan and if you are aware of any assets of Mr. Pinnas which might serve *to satisfy the current obligation.* (emphasis supplied)

It will of course be recognized at once that the writer of the letter, if he truly set forth what he was advised by the Board, was misled, a strange situation indeed since two of the Board members supposedly present at the critical meeting were law partners of the writer and entered testimony in this proceeding at variance with the letter. *See* Footnote 4, *supra. See also* Ex. P-4—collection letter from Baumann to Pinnas, dated April 6, 1967; Ex. P-5—letter from Baumann to Arnold R. Kent, Esq., dated April 11, 1967, "in accordance with our

discussion" to start legal action (Mr. Kent was a director, counsel, secretary and stockholder).

Even at this point it apparently did not occur to anyone that the Pinnas loan was a "dishonest" act. *See also* Minutes of August 8, 1967, prepared and signed by Mr. Kent:

> A long discussion was had in regard to the Martin Pinnas loan which was granted by former President Winters without Board authorization and directly contrary to instructions of the Board wherein said Board specifically instructed Mr. Winters not to grant the loan when an application had appeared before it. The Board of Directors unanimously directed that the Bank go on record with Mr. Winters advising him of the difficulty in the collection of the $15,-000.00 balance on this loan and that in the event of the Bank's failure to recover that the Bank would seek redress against Mr. Winters for his diliberate (sic) violation of Board instructions.

As is the case with the September 11, 1967, letter, the foregoing minutes misstate the facts. Mr. Kent testified in these proceedings and never mentioned that an application had come before the Board for a loan. This is not a case of such an application having been made to the Board and rejected, with Winters thereafter granting it. Were it so, we might well have a different result.

**940**

wrongdoing as would manifest a knowing breach of instructions. The loan file, evidencing every step taken by him in the transaction, was open and available at all times for Board review.

It is said by the Bank that Winters was reprimanded on October 4, 1966, for violating Board orders. He denies this. The minutes say nothing about it. I find that the general tenor of the material in the minutes suggests that had he been reprimanded, and had there been a violation of orders, it would have been reflected in the minutes.

Winters continued to function as president after October 4, 1966, to the Board's obvious satisfaction, as reflected by praise of his work, a $2,500 raise, and his appointment to the Financing Committee. Board disenchantment with Winters is not apparent until his resignation was accepted, but there is no indication this is related to the Pinnas loan.

■ It is clear what happened here. Neither the Board nor its counsel, who also served as directors and officers, and were stockholders as well, contemplated that Winters' extension of credit to Pinnas was a "dishonest" act until all efforts to collect on it had resulted in only a partial recovery. Then, and only then, as reflected in the minutes of a Board meeting of November 21, 1967, was it decided to file claims under the fidelity bonds. Notices to the bonding companies then followed, to Fireman's on De-

cember 15, 1967, and to Aetna on January 11, 1968.[11]

Accordingly, it is determined that plaintiff has failed to sustain its cause of action and that judgment should be entered in favor of the defendants, with costs. The cross claims and the third-party complaint are of course dismissed.

11. The defendants' affirmative defenses of untimely notice and institution of suit (and plaintiff's claim of waiver thereof) raise serious issues. Suit was started against Fireman's in January, 1969, and Aetna in March, 1969. For purposes of appellate review, if it is sought, I hereby find that the time to give notice, and commence suit, began on October 11, 1966, when, according to plaintiff, it had all the facts upon which its claim herein was based, that is, a bad loan allegedly in violation of orders.

Delay in giving notice prejudiced the defendants since in the meantime Pinnas

was in bankruptcy proceedings. On the other hand, defendants did not in their denials of liability raise the untimeliness of notice, thus generating the issue of waiver. Mariani v. Bender, 85 N.J.Super. 490, 205 A.2d 323 (App.Div.1964); Capece v. Allstate Insurance Co., 86 N.J. Super. 462, 207 A.2d 207 (App.Div.1965). This issue, along with Aetna's claim it was not, but should have been notified on February 1, 1967 when its bond became effective, of Winters' violation of orders, need not be resolved, in view of the determination made.