NATIONAL NEWARK AND ESSEX BANK, PLAINTIFF-
APPELLANT-CROSS-RESPONDENT, v. THE AMERICAN
INSURANCE COMPANY, DEFENDANT-RESPONDENT-
CROSS-APPELLANT.

Argued November 28, 1977—Decided April 27, 1978.

*Mr. Eugene M. Haring* argued the cause for appellant-cross-respondent (*Messrs. McCarter and English,* attorneys; *Mr. Haring,* of counsel and on the brief; *Mr. Richard M. Eittreim,* on the brief).

*Mr. Charles H. Hoens, Jr.* argued the cause for respondent-cross-appellant (*Messrs. Lum, Biunno and Tompkins,* attorneys; *Mr. Hoens,* of counsel and on the brief; *Mr. Dennis J. Drasco,* on the brief).

The opinion of the court was delivered by

PASHMAN, J. This appeal requires the Court to determine whether the fidelity provisions of a Banker's Blanket Bond issued to the plaintiff Bank provide coverage for the losses caused by the conduct of one of its employees under the rather unusual circumstances of this case. If coverage is found to exist, we must next determine whether the filing of the claim herein was timely under the limitation period specified in the bond.

National Newark and Essex Bank, now named Midlantic National Bank (hereinafter the Bank), seeks indemnification from the American National Insurance Company (Insurer) for losses resulting from the improper actions of a Vice-President and Branch Manager of the Bank, William C. Bowers, with respect to his handling of large collateralized loans. It is undisputed that the Banker's Blanket Bond was in effect at all times pertinent to the events of this case. The fidelity provision of the Bond (coverage A) committed the Insurer to indemnify the Bank for:

Loss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss, through any such act of any of the Employees of Property held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefor.

Section 4 of the Bond, on timeliness of claims, provided that:

At the earliest practicable moment after discovery of any loss hereunder the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars. Legal proceedings for recovery of any loss hereunder shall not be brought prior to the expiration of sixty days after such proof of loss is filed with the Underwriter nor after the expiration of twenty-four months from the discovery of such loss, except that any action or proceeding to recover hereunder on account of any judgment against the Insured in any suit mentioned in General Agreement D or to recover attorneys' fees paid in any such suit, shall be begun within

twenty-four months from the date upon which the judgment in such suit shall become final. If any limitation embodied in this bond is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.[1]

The limit of liability under the Bond was $4,000,000.

William C. Bowers' banking career began in 1948 with a bank which merged with National Newark and Essex Bank in 1950. He steadily worked up through the ranks until becoming Branch Manager of the Watsessing office in January 1965. Bowers was introduced to a Bank customer named Charles D. Erb, Jr. in 1965 by the outgoing branch manager, who indicated that the Bank considered the Erb family's longstanding account to be an excellent one. Erb's collateral loan account dated back to 1961, and from 1965 to January 1969 the outstanding balance remained relatively constant. During this period he traded stocks and often exchanged stocks held in his account for other stocks.

In early 1969 Erb became a partner of Baerwald & De Boer, a registered brokerage firm in New York City. He called upon Bowers to lend him increasing amounts of capital, obtaining six loans between January 16 and August 1, 1969.

Under the Bank's internal regulations, Bowers was authorized to grant unsecured loans of up to $25,000 and secured loans of up to $50,000 without obtaining the approval of the head office. He could also increase any loan whose outstanding balance was already more than $50,000 to $75,000. For all other loans he was required to secure the approval of a superior by submitting a report form to the central office of the Bank. Bowers testified that he was familiar with these rules and regulations and that he followed them.

---

[1] The Insurer never raised the issue as to whether the Bank's proof of loss was within six months of its discovery of the loss. Thus the issue is not before us and we will not comment on it.

All of the above loans were also subject to margin requirements. The bank's own guidelines set a 70% maximum margin for "non-purpose" loans.[2] Moreover, branch managers were required to complete Federal Reserve Form U–1, titled "Statement of Purpose of the Proceeds of a Stock-Secured Extension of Credit by a Bank." This form requires a statement of the amount of the loan, the collateral pledged to secure the loan, the market value and source of valuation of that collateral, and the purpose for which the proceeds of the loan are to be used by the borrower. The Bank's signing officer must affirm his familiarity with the provisions of Regulation U and that he has accepted the customer's statement of purpose in good faith.[3]

Branch managers were required to margin all secured loans on a monthly basis to ensure that the market value of the securities held as collateral was sufficient to maintain the required margin on the outstanding loan. Where the market value had fallen to the point where the Bank's margin requirements were not met, branch managers were directed

[2]The margin percentage defines the extent to which a customer may borrow on a given security. A 70% margin requirement means that the Bank will not lend more than 70% of the market value of the securities held as collateral for the loan.

"Purpose" loans are loans made for the purpose of acquiring or carrying stocks where either listed or unlisted stocks constitute all or a part of the collateral. Regulation U of the Federal Reserve Board governs the margin requirements for purpose loans. See generally *Peoples National Bank of N. J. v. Fowler*, 73 *N. J.* 88, 96–97 (1977). "Nonpurpose" loans are loans which are used for any other purpose. Although not subject to the margin requirements of Regulation U, these collateral loans must be reported on Federal Reserve Form U–1.

[3]On the face of the form is a definition of "good faith" which reads as follows:
Good faith requires that such officer (1) must be alert to the circumstances surrounding the credit, and (2) if he has any information which would cause a prudent man not to accept the statement without inquiry, has investigated and is satisfied that the statement is truthful.

to request additional collateral from the borrowers. They were also responsible for monitoring the checking accounts of borrowers to enforce the Bank's requirement that a 20% compensating balance corresponding to the outstanding loan be maintained at all times. Lending officers were expected to keep collateral for loans in the Bank's possession. A customer was not to sell a pledged security until the branch manager determined whether the collateral offered in replacement was satisfactory. If so, he would arrange for sale of the security by a brokerage house, taking a check at the time of delivery and reducing the amount of the loan until the customer delivered new collateral to the Bank. At that time a new note would be signed and a new Regulation U form completed.

In the first eight months of 1969 Bowers granted Erb six loans in the following amounts: $40,000 on January 16, $15,000 on February 20, $30,000 on March 24, $62,000 on May 16, $80,000 on June 4, and $93,000 on August 1. Every one of these loans was preceded by an overdraft in Erb's checking account, and the amount of the loan subsequently approved was usually close to the amount overdrawn. Bowers completed the Federal Reserve U-1 forms for each of these loans. Despite his knowledge that each loan was for purposes of covering an overdraft, he usually wrote a brief statement indicating a business use for the funds. Bowers claimed that these overdrafts had been created for business purposes. He never investigated the purposes of these loans.

Bowers adamantly maintained that he had approval for all of his loans of over $50,000. Yet, Erb's credit file, which should have included an approval form for each of these loans, contained only one form relating to the loans in question — the June 4 loan of $80,000. That form was signed by Richard F. Monks, the Vice-President in charge of collateral loans. However, Monks testified that he approved the loan on the representation that the stated collateral of $448,774 was in the Bank. In fact, there was only $225,456

on hand and the loan balance was $303,900. Bowers testified that he margined Erb's account by including securities due to arrive from Baerwald & De Boer among the collateral. Franz Arzt, who audited Bowers' branch in early 1970, testified that the usual practice was only to value securities in the Bank's possession.

The August 2 loan of $93,000 was directly contrary to instruction by Monks, who had indicated that after the June 4 loan all future loans to Erb would be strictly on "an offering basis." Bowers listed $570,000 collateral on the U-1 form, when the actual collateral on hand was $377,280. On August 21 and 29 he released securities to Erb worth nearly $330,000, leaving $41,644 as collateral for a loan balance of $396,989. Bowers was promised securities worth $125,000 to replace the collateral released. However, until mid-December, when Erb's father pledged additional securities worth $170,000, the level of collateral remained constant. On December 30 and January 14, 1970 Bowers complied with Erb's request for the release of securities in the account, leaving $180,062 to secure the loan totalling $396,989.

On May 14, 1969 Bowers granted a loan of $125,000 to one Bertram A. Knight, a customer of Erb's brokerage firm, taking 100,000 shares of Academic Systems & Management Corp. stock as collateral. Despite a restrictive legend across the face of the stock indicating that it was marketable under only limited circumstances, Bowers never checked for himself to verify that the stock was selling for $5 a share, as represented by Erb. He did have Erb sign a limited guarantee for the note. Bower's testimony that he had obtained prior approval for this loan was contradicted by other witnesses. The interest on the Knight loan was in default after July and the stock was trading at $1 a share in October. The note was called in January 1970.

Erb's partner at Baerwald & De Boer, Thomas Oswald, completed the firms financial statements to the New York Stock Exchange. When Erb professed to be unsure of the amount of collateral securing his loans at the Bank, a three-

way conference call with Bowers was arranged to obtain the figures necessary for Oswald's November 1969 report. Bowers represented that the total loan was $396,989 with collateral of $632,500. The actual collateral on hand at that time was no more than $50,000.

In January 1970 Mr. C. Richard Carlson, then Vice-President and Senior Mortgage Officer of the Bank, was given overall responsibility for the supervision of collateral loans. His first action was to assign Franz Arzt to investigate and review outstanding loans in all branches of over $100,000 to determine whether they were sufficiently collateralized. Arzt soon discovered the collateral shortage in the Erb account, the undermargining of loans approved by Bowers, the large overdrafts and the constant violation of the 20% compensating balance rule. On his second visit in January he learned that Bowers had been making loans in excess of his authority. After review within the bank the Erb loan was recalled on January 27, 1970, by a letter of Bowers at the instruction of his supervisors. A conference was held on February 6, 1970, with Arzt, Carlson, Bowers and Erb participating, at which time it became clear that Erb would be unable to meet his obligations. Carlson thereupon telephoned Erb's father and advised him of the Bank's intention to liquidate the collateral. The senior Erb told Carlson not to sell his securities because the Bank had allegedly failed to comply with his request for an hypothecation agreement. When Erb failed to deliver any more securities, Carlson instructed Arzt to sell the collateral in the account, including the securities of Erb's father.[4]

---

[4]Erb's father subsequently brought suit against the Bank in federal court to recover the value of his securities on the ground that the Bank had fraudulently concealed its intent to call his son's loan. His complaint also alleged that Bowers' release of collateral had impaired his pledge. The Bank's request for indemnification includes any amounts recovered by the plaintiff in this action, plus its attorneys' fees.

On February 18, 1970 the Bank's Assistant Vice-President, Kenneth C. Kirby, sent the following letter to the Insurer:

For your information we discovered on February 9, 1970 that a secured loan at our Watsessing Office, 59 Dodd Street, Bloomfield, New Jersey, made to a Mr. Charles D. Erb totalling $397,000 was undermargined in the amount of approximately $200,000. In addition, we find that Mr. Erb has guaranteed a loan made to Bertram A. Knight in the amount of $125,000 secured by collateral of very little value. The undermargined condition created by insufficient collateral was authorized by Mr. William C. Bowers, Branch Manager. We are making this report for your information pursuant to Section 5225 of the Comptroller's Rulings. So far as our investigation has yet gone, we have no tangible evidence of defalcation, mysterious disappearance, kiting operation or other purported act. Nevertheless, the matter is of sufficient size and complexity that we feel obligated to bring it to your attention in this fashion.
Our management has been informed of this situation and steps have been taken to protect the bank's interest.[5]

In response to this letter the Insurer set up a file, filling out a sheet entitled "Claims Make-Up Instruction." Frank J. Galdieri, a Bond Claims Supervisor at the Insurer's Newark Office, prepared an extensive memorandum to the head of the regional office. The memorandum reviewed the actions of Bowers with respect to the Erb and Knight loans, including the Bank's sale of collateral and litigation commenced by

---

[5]The applicable section of Regulations of the Comptroller of the Currency, 12 *C. F. R.* § 5225, requires written notice to the Regional Administrator of National Banks, the F. B. I., the U. S. Attorney and the bonding company of the following:

(1) Any known or suspected theft, embezzlement, check-kiting operation, misappropriation or other defalcation involving bank personnel or bank funds in any amount. Where there is reason to suspect any person or persons in connection with the event, the identity of such persons and the reason for suspicion shall be included in the report.

(2) Any state of facts growing out of the affairs of the bank known or suspected to involve criminal violation of any other section of the United States Code.

(3) Any mysterious disappearance or unexplained shortage of bank funds or other assets of $1,000 or more.

the Bank in New York against Erb and Baerwald & De Boer. It also noted that two meetings were held with Kirby and Carlson, where those two indicated that the Bank was not yet ready to accuse Bowers of dishonesty or fraud. Internal memoranda of the Insurer during 1970 made it clear that it was aware of all litigation involving the Erb and Knight loans. A December 22, 1970 memorandum indicated that the Bank had requested a meeting to discuss this matter.

On February 25, 1971 a meeting was held between Kirby, Carlson and Roger Ward, the Bank's counsel, and two representatives of the Insurer. The Insurer was advised that the Bank had prepared a claim on the Blanket Bond on the ground of dishonesty on the part of Bowers. On February 26, 1971 the bank filed a proof of loss. It also submitted a memorandum detailing the circumstantial evidence showing dishonesty by Bowers. Soon thereafter, the Insurer questioned Bowers and reviewed the charges set forth in the memorandum, and ultimately concluded that none of the Bank's claims was valid

The Insurer then arranged for a second conference with Bank officials. The conference was held on May 26, 1971. The Insurer's representatives firmly stated that there were no proofs to support the claim. Testimony by Ward and Galdieri as to whether the Insurer discussed and negotiated or definitively denied coverage was conflicting. However, the Insurer did accept for study the collateral loan cards mailed by the Bank. On October 26, 1971 Galdieri met with Ward at his law office to review the correspondence and pleadings of the various lawsuits concerning the Erb loans, which had been assembled for inspection. Galdieri concluded that there was nothing new to alter the Insurer's conclusion and informed Ward that coverage was denied. On November 5, 1971 Galdieri sent a letter denying coverage.

The Bank filed a complaint in the Chancery Division on June 26, 1973, seeking indemnification for the uncollected loans, totaling some $450,000, counsel fees for suits against the defaulting parties and potential liability in a counter-

suit brought by the elder Erb, whose collateral had been sold when the loans defaulted. The complaint asserted claims based on three provisions of the Bond: Coverage A (dishonesty of an employee), Coverage B, (false pretenses by a customer), and Coverage D (forgery). The Insurer denied coverage on all three grounds and raised an affirmative defense based on Section 4 of the bond, which requires commencement of· legal proceedings not more than 24 months after discovery of loss by the insured.

At the close of the plaintiff's case the chancery judge dismissed the forgery claim based on Coverage D. In an unpublished written opinion, the judge dismissed the false pretenses claim under Coverage B on the ground that the Bank's losses resulted from non-payment of or default on a loan made by the insured, and thus fell within the clause excluding loan transactions from Coverage B. He also found insufficient proof to sustain the contention that the debtor had intended to renege on his promise to return collateral to the Bank at the time he convinced Bowers to release his securities.

However, the Chancery Judge did find that Bowers' conduct was dishonest or fraudulent within the meaning of Coverage A. He cited *Mortgage Corp. of N. J. v. Aetna Cas. & Surety Co.,* 19 *N. J.* 30 (1955), for the proposition that the absence of any personal gain or profit did not preclude a finding of dishonesty. He catalogued the numerous occasions on which Bowers had departed from well-known banking rules and practices and had misrepresented or failed to disclose important facts concerning the loans. In view of Bowers' position of authority as an officer of the Bank, the court asserted that these transgressions should be assessed by the standards of trust and probity of a fiduciary, rather than by standards of competence or soundness of judgment. In placing Erb's interests above those of his employer, Bowers was held to have breached his trust and therefore acted dishonestly within the coverage afforded by the policy.

The court next held that despite the existence of coverage, the claim was barred by the contractual provision requiring that suit be brought within 24 months after discovery of the loss by the insured. The Chancery Judge held that the Bank had discovered the loss by early February 1970, and that some 40 months had elapsed before it brought suit. He rejected the Bank's contention that the letter of February 18, 1970 to the Insurer constituted sufficient notice to toll the Bond's limitations period under *Peloso v. Hartford Fire Insurance Co.,* 56 *N. J.* 514 (1970). The judge distinguished *Peloso* because the notice there was sufficient to alert the company to a claim of a covered loss. The judge noted, by way of contrast, that the Bank's letter had specifically disclaimed any allegation of coverable wrongdoing and had not even announced that a loss had definitely been incurred. Notice sufficient to toll was held to have been given only as of the filing of the formal proof of claim in February 1971. Since that tolling period ended in November 1971 when the claim was officially denied, the suit was out of time.

The Bank appealed from the dismissal of the complaint and the Insurer cross-appealed the decision as to coverage. The Bank did not contest the trial court's dismissal of its claims under Coverage B and Coverage D. The Appellate Division affirmed the trial court in an unpublished *per curiam* decision essentially on the reasoning of the opinion below. We granted certification of the Bank's appeal on the timeliness issue and of the Insurer's cross-appeal on the coverage issue. 73 *N. J.* 61 (1977).

I

*COVERAGE*

■ The first question to be addressed is whether the acts of Bowers were "dishonest or fraudulent" under the Bond. The leading New Jersey case on this issue is *Mortgage Corp. of New Jersey v. Aetna Cas. & Surety Co.,* 19 *N. J.* 30

(1955), where the words dishonest and fraudulent were given broad scope. Justice Jacobs interpreted them to ". . . evidence the clear intent to protect the employer against employees' wrongful acts which, though not criminal, nevertheless display a significant lack of probity, integrity or trustworthiness." 19 *N. J.* at 36. He went on to quote approvingly from *Citizens Trust & Guaranty Co. of West Virginia v. Globe & Rutgers Fire Ins. Co.*, 229 *F.* 326, 330 (4 Cir. 1915) where the court held that these terms extend beyond criminal acts and are " 'to be given a broad signification and taken most strongly against the surety company'." *Id.* 19 *N. J.* at. 37. Other cases have reached similar conclusions. In *Exeter Banking Co. v. Taylor*, 85 *N. H.* 458, 160 *A.* 733, 735 (1932), the court held that the words dishonest or fraudulent, as used in Fidelity Bonds, are accorded wide scope, encompassing "any acts which show a want of integrity or a breach of trust." Also covered is conduct which indicates "a reckless, willful and wanton disregard for the interest of the employer — if it be an act manifestly unfair to the employer and palpably subjects him to likelihood of loss," *London and L. Indem. Co. v. People's National Bank and T. Co.*, 59 *F.* 2d 149, 152 (7 Cir. 1932).

Under *Mortgage Corp., supra,* the fact that Bowers did not personally profit from his lack of supervision is irrelevant.

The test is not whether he intended to personally profit by his course, though that he did is perhaps a permissible inference from the facts shown. He occupied a position of trust and confidence which he secretly betrayed. He received compensation for guarding the interests of his employer and he was willfully, intentionally, and grossly faithless.

[*United States Fidelity & Guaranty Co. v. Egg Shippers' S. & F. Co.*, 148 *F.* 353, 355 (8th Cir. 1906), quoted in *Mortgage Corp., supra,* 19 *N. J.* at 37. *See also Citizens State Bank v. Transamerica Insurance Co.*, 452 *F.* 2d 199, 203 (7 Cir. 1971) (summarizing different decisional definitions of dishonest and fraudulent).]

However, at the same time, it is recognized that instances of mere neglect or incompetence of employees are not covered by fidelity bonds protecting the insured from dishonest or fraudulent acts. *Mortgage Corp. of N. J. v. Aetna Cas. & Surety Co., supra,* 19 *N. J.* at 37; *Essex County State Bank v. Fireman's Fund Ins. Co.,* 331 *F. Supp.* 931, 937–938 (D. N. J. 1971).

The facts in the *Mortgage Corp.* case, while decidedly different in their particulars from those in the instant matter, are certainly applicable by analogy. There the Court overturned two jury verdicts in favor of a bonding company, and found an employees' conduct dishonest as a matter of law. The employee worked for a construction lender which released payments to housing developers as they completed specified sections of their houses. His job was to personally inspect building sites to verify that the work had been done before his employer made the payments. In a four month period he made 92 false certifications respecting a particular housing development. He testified that a severe storm had added to his other work related responsibilities and that personal visits to that development were exceedingly difficult. He had relied on the builder to honestly inform him of progress on the buildings.

What Harrison did was done wilfully and was continued over a period of four months. On 92 occasions he certified that he had made personal inspections when he knew that such certifications were false and that his employer, being unaware of their falsity, would disburse large sums in reliance thereon. He deliberately failed to tell his employer that he was not making personal inspections because he was afraid he would lose his job; and this though he knew that the very purpose for which he was hired as inspector was to make personal inspections and to issue his certifications on the basis thereof. Under the admitted facts he palpably was faithless to his trust and deceived his employer; it matters not that his conscious deceptions may not have been accompanied by intent to cause actual monetary loss to his employer and may have been induced by motives of personal comfort or convenience rather than personal profit or gain for, in any event, his conduct was morally as well as legally wrongful.

In the light of all the foregoing we are convinced that Harrison's misconduct must fairly be held to be the type of action which fell within the reasonable and proper coverage expectations of the parties to the fidelity bond issued by the defendant to the plaintiff.

[19 *N. J.* at 40]

We find that the *Mortgage Corp.* holding controls this case. The subjective intent of Bowers may have been blameless, but the nature of his acts clearly indicates that he put Erb's interests above those of his employer. We agree with the trial court's characterization of his duties as being fiduciary in nature. Moreover, the trial court cited three instances in which Bowers knowingly misrepresented the value of the collateral held by the bank: (1) the loan report form for the June 4, 1969 increase in Erb's outstanding balance, (2) the Federal Reserve Form U–1 for the August 1, 1969 loan and (3) the conversation with Erb's partner, Thomas Oswald. The court also rejected Bowers' explanation that the described use of the loans as business related was an accurate reflection of their use in covering Erb's overdrafts. Bowers' conduct also fell far short of the federal requirement of good faith investigation, *see ante* at 68 with respect to the representations on the U–1 forms. He not only ignored bank regulations in honoring the overdrafts, but, as found by the trial judge, failed to obtain approval from his superiors for the loan increases.

Our review of these findings is limited to determining whether they are supported by "adequate, substantial and credible evidence." *Leimgruber v. Claridge Associates, Ltd.,* 73 *N. J.* 450, 456–7 (1977); *see Rova Farms Resort v. Investors Ins. Co.,* 65 *N. J.* 474, 483–4 (1974); *State v. Johnson,* 42 *N. J.* 146, 162 (1964). We find that the above recited trial court findings not only meet the test, but are overwhelmingly supported by the evidence. Thus, consistent with *Mortgage Corp., supra,* we hold that Bowers' conduct was dishonest and fraudulent within Coverage A of the Bond.

## II

### TIMELINESS OF SUIT

In view of our conclusion that the Bond covers the losses occasioned by Bowers' misconduct, we must now determine whether suit was barred by Section 4 of the Bond, which does not permit suit "after the expiration of twenty-four months from the discovery of such loss." At the latest, the loss was known to the bank in February 1970. Absent some reason for tolling the Section 4 limitation, any suit commenced after February 1972 would be out of time. The complaint herein was not filed until June 26, 1973. Thus, the question to be addressed is whether the trial court correctly applied *Peloso v. Hartford Fire Insurance Co.*, 56 *N. J.* 514 (1970), as a controlling precedent to the facts of this case.

In *Peloso* a fire insurance policy contained the standard statutory limitation, *N. J. S. A.* 17:36–5.20, which required commencement of suit "within twelve months next after inception of the loss." On September 12 and 13, 1965, the premises in question were damaged by fire. Notice to the insurer was furnished on September 15. Defendant insurer advised plaintiffs that it intended to investigate the claim, following which notice would be given of its decision. The investigation was a protracted one. Plaintiffs were even required to submit to depositions, which they did on April 6, 1966. Not until June 15, 1966 did the insurer furnish plaintiffs with written notice that liability was being denied. Plaintiffs instituted suit on March 10, 1967.

This Court reasoned that there was an incongruity in the statute since it appeared to give the insured twelve months in which to sue, but in reality gave him far less time. Proofs of loss were to be supplied the insurer within 60 days of the initial notice. Suit could not be brought for 60 days after the insurer received proofs of loss. The Court resolved the incongruity by holding that the period of limitation ran from the date of the casualty, but was tolled

from the time the insured gives notice until liability is formally denied.

In this manner, the literal language of the limitation provision is given effect; the insured is not penalized for the time consumed by the company while it pursues its contractual and statutory rights to have a proof of loss, call the insured in for examination, and consider what amount to pay; and the central idea of the limitation provision is preserved since an insured will have only 12 months to institute suit. We think this approach is more satisfactory, and more easily applied, than the pursuit of the concepts of waiver and estoppel in each of the many factual patterns which may arise.

In the instant case 2 days had transpired between the start of the fire and the date notice was given thereof to defendant. Thereafter, the parties negotiated for 9 months. During this time, the statute was tolled. It did not begin to run again until June 15, 1966, when plaintiffs were notified in writing that liability was denied. Plaintiffs then had 12 months less 2 days to institute suit. Since they did so within 9 months of June 15, 1966, plaintiffs' suit was timely and summary judgment was improper.

[56 *N. J.* at 521]

■ Of course, there is a vast difference between a fire insurance policy and a fidelity bond. While discovery of the insured loss under the former is self-evident and not difficult to date, serious difficulties inhere in pinpointing the exact time of discovery of a loss under the latter. "Discovery" of a loss under a fidelity bond occurs when the insured learns facts or obtains knowledge which would justify a careful and prudent person in charging another with dishonesty or fraud. *American Surety Co. v. Pauly,* 170 *U. S.* 133, 18 *S. Ct.* 552, 42 *L. Ed.* 977 (1898); *Federal Deposit Ins. Corp. v. Aetna Casualty & Surety Co.,* 426 *F.* 2d 729, 739 (5 Cir. 1970); *Alfalfa Electric Coop., Inc. v. Travelers Indemnity Co.,* 376 *F. Supp.* 901, 906 (W. D. Okl. 1973); *Prior Lake State Bank v. National Surety Corp.,* 248 *Minn.* 383, 80 *N. W. 2d* 612, 616 (1957). Mere suspicions of irregularities or improper conduct do not require the insured to report such acts. *American Surety Co. v. Pauly, supra; Prior Lake State Bank v. National Surety Corp., supra; Federal Deposit Insurance Corp. v. Lott,* 460 *F.* 2d 82, 86–87

(5 Cir. 1972). As the court said in *Perpetual Bldg. & Loan Ass'n v. United States Fidelity & Guarantee Co.*, 118 *Iowa* 729, 92 *N. W.* 686, 688 (1902):

Knowledge of a defalcation frequently depends on a long train of events, or the examination of extended accounts. Discrepancies or irregularities, confirmatory in themselves of guilt, are often explainable, or turn out to be entirely consistent with innocence. The confidence of years is not ordinarily shattered in an instant, and the employer may be commendably slow to be convinced of the depravity of the person whom he has implicitly trusted. Unjust inferences and false accusations are always to be avoided. The truth, only after being ascertained with reasonable certainty, can be safely made known. Character is too sacred to permit tolerating of a less liberal rule.

The Bank alleges that it was not until the first week of 1971 that it concluded that the picture of apparent wrongdoing was sufficiently detailed for it to turn over the whole file to the Insurer. The Bank accordingly claims that it cannot be charged with discovery of the loss prior to that time. However, it is clear that in early 1970 Arzt and Carlson had extensive knowledge of Bowers' excessive loans to Erb, the fact that collateral had been wrongfully released, and of the generally confusing, illegible collateral loan cards. Arzt knew that there were only two loan approval cards in the Erb file, only one of which pertained to a loan pertinent to this case. He also knew that the collateral for the Knight loan was essentially worthless for that purpose.

On appeal, the Bank asserts that Arzt and Carlson did not have knowledge of either Bowers' misrepresentation on the June 4, 1969 Report Form or the misrepresentation to Oswald. It also claims that they made no connection between the overdrafts and the loans, and were thus unaware of the false purposes on the Federal Reserve Forms U-1. This theory, however, was not sufficiently supported by its proofs since the sole witness testifying thereto at trial was Ward, plaintiff's counsel. Thus, the finding of the Chancery Judge that by February 18, 1970 the Bank was fully cognizant

of the essential facts concerning the released collateral and the unauthorized loans will not be disturbed, as it is supported by "adequate, substantial and credible evidence." *See ante* at 78.

Pursuant to Section 4 of the Bond, the limitations period begins to run as of discovery of the loss. Without any tolling of the limitation provisions, plaintiff Bank had from February 18, 1970 until February 18, 1972 to bring suit. *Peloso* provides for such a tolling for the period between the time the notice of a claim was furnished to the insurer and the time of the insurer's formal denial of coverage. The trial judge in this case found that no "meaningful" notice of a claim was made until February 26, 1971 when the Bank filed a proof of loss. He reasoned that notice, for *Peloso* purposes, required that the insurer be apprised that a covered loss has been incurred. The letter of February 18, 1970 from the Bank to the insurer carefully avoided any allegation of infidelity and dishonesty. It affirmatively declared that "we have no tangible evidence of defalcation, mysterious disappearance, kiting operation or other purported act." The judge below interpreted notice under *Peloso* to be a statement of facts which could reasonably be read to call upon the insurer to admit or deny liability. Obviously, the February 18 letter would not meet this standard.

We disagree with the definition of notice utilized by the trial judge. While recognizing that some danger inheres in a system where a limitations period can be tolled by a notice which expressly disavows any present intention to make a claim, to hold otherwise would encourage insured parties to withhold any information about a possible claim until it is so far perfected that a formal proof of loss is submitted. This procedure would cause needless delay in the administration of insurance claims. We conclude that the purpose of a notice of loss provision is to allow the insurer an opportunity to commence investigation and to protect its interests. *See Sutton v. Fire Ins. Exchange*, 265 *Or.* 322, 509 *P.* 2d 418, 419 (1973); *Sterling State Bank v. Virginia*

*Surety Co.*, 285 *Minn.* 348, 173 *N. W.* 2d 342, 346 (1969) ;
5A *Appleman, Insurance Law and Practice*, § 3481. *See
also Ebert v. Balter*, 74 *N. J. Super.* 466, 473 (App. Div.
1962). Nowhere in *Peloso* did we indicate that notice of loss
and proof of loss are one and the same. As several cases have
noted :

\* \* \* [T]he purpose of the notice of loss is to acquaint the insurer
with the occurrence of the loss, while the requirement of proof of
loss gives to the insured the necessary data to determine liability.
Substantial compliance with such provisions suffices.

> [*Sterling State Bank v. Virginia Surety
> Co., supra*, 173 N. W. 2d at 346]

\* \* \* Proof of loss is distinguishable from 'notice of loss' which
is also required by the policy. The sole purpose of notice of loss is
'to enable the insurer to take proper action to protect its interests.'

> [*Sutton v. Fire Insurance Exchange,* '265
> Or. 322, 509 *P.* 2d 418, 419 (1973) ;
> citing *Appleman, supra*]

█ The letter of February 18 from the Bank to the In-
surer, see *ante* at 72, indicated that the loans to Erb
and Knight, approved by Bowers, were seriously undermar-
gined. It further specified that the notice was being served
in order to comply with the requirements of the Comptroller
of the Currency, 12 *C. F. R.* § 5225. See *ante* at 72 n. 5.
It also informed the Insurer that the Bank was investigating
the matter. The Insurer was kept aware of all material in-
formation relating to the investigation, and knew of the liti-
gation surrounding the loans. In essence, the Bank claims
that this letter constituted notice of loss. Moreover, the In-
surer opened a claim file and had numerous internal memo-
randa prepared as a direct result of receiving that letter. We
find that this letter provided notice of loss within our defi-
nition of that term.

The trial court indicated that notice of loss, to be mean-
ingful, would have to be notice pertaining to a covered loss.
While that observation is essentially true, it goes too far by
equating notice with proof of loss. Had the Bank not be-

lieved that the losses incurred by Bowers' actions might be found at some point to be within the coverage of the Bond, it would never have sent the February 18, 1970 letter. Moreover, we wish to encourage insured parties to inform insurers promptly of any losses that might lead to claims. With both parties investigating simultaneously, the chances of an expeditious settlement are enhanced.

A risk inherent in this liberal tolling policy is that insured parties will give prompt notice and then, with time pressure removed, take an inordinately long time to investigate the matter and file a formal proof of loss. However, we believe that this danger is more imagined than real, as most insured parties will wish to collect on their claims as soon as possible. In the instant case, the Bank ran a careful check on Bowers to ascertain whether he had benefitted from his wrongful acts, and waded through numerous documents and records which were tied up in various suits. Thus, we do not believe that there was undue delay prior to the filing of the formal proof of loss on February 25, 1971. It must be kept in mind that matters of monetary mismanagement by trusted employees are among the most difficult to expose and to properly characterize.

However, in a case where the insured is clearly not diligently investigating its possible claim, the insurer may always put pressure for proof of a covered loss. In an extreme case, it might even deny coverage prior to receipt of a proof of loss. We believe that our experienced trial judges will be able to detect any such bad faith on the part of insureds and to deal with it appropriately. We further note that in most instances such delay can benefit only the insurer. It retains the use of later claimed funds with no risk of interest being added to any subsequent judgment, as prejudgment interest with respect to judgments of an unliquidated nature on contractual claims is only chargeable where equitable. *See Manning Engineering, Inc. v. Hudson Cty. Park Comm.,* 71 *N. J.* 145, 159 (1976). It would not be

equitable to charge such interest for a period prior to the insured's proof of claim.

The judgments of the lower courts, which equate proof of loss with notice of loss for purposes of tolling the Bond's limitations period, are reversed. The limitations period was tolled from February 18, 1970 until the Insurer's formal denial of coverage on November 5, 1971. Thus, even if the Bank discovered the loss somewhat before February 1970, its suit of June 26, 1973 was timely under the Bond. The case is remanded for trial on the issue of the actual extent of the covered losses incurred by the Bank.

SULLIVAN, J. (dissenting). I would affirm the judgment in favor of defendant on the ground that the loss in question was not through any "dishonest or fraudulent" acts on the part of Mr. Bowers, the branch manager of the bank, within the meaning of coverage A of the fidelity provisions of the Banker's Blanket Bond issued by defendant.

It is clear that the bank considered the Erb family's long-standing account to be an excellent one. Mr. Bowers was so informed when he took over the branch as manager in 1965. Because of this, Erb enjoyed a special status with the bank and the evidence shows he took advantage of it.

This was a loss on a loan account of a favored customer that was simply allowed to get out of hand due to poor judgment and negligence on the part of the branch manager as well as other responsible officers of the bank. If what happened here is within coverage A, almost any bank loan account loss can be claimed to come under such coverage.

The leading case relied on by the majority herein in reaching its conclusion is *Mortgage Corp. of New Jersey v. Aetna Cas. & Surety Co.*, 19 N. J. 30 (1955). Aside from the fact that the employee's misconduct in that case was much more grievous, it is a 4 to 3 decision by this Court. Without belaboring the point, I agree fully with Justice Heher's legal argument in his dissenting opinion in that case. 19 N. J. at 42. I would affirm.

*For reversal and remandment*—Chief Justice HUGHES, and Justices PASHMAN, CLIFFORD, SCHREIBER and HANDLER—5.

*For affirmance*—Justice SULLIVAN—1.